J-S02033-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 1269 EDA 2017 |

Appeal from the Order Entered March 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-001231-2016,
CP-51-DP-0001077-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: R.L.C.-E. A/K/A R.C.-E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1272 EDA 2017 |

Appeal from the Order Entered March 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-001230-2016,
CP-51-DP-0002538-2015

| | | |
|---|---|---|
| IN THE INTEREST OF: G.J.C.-E. A/K/A G.C.E., A MINOR  APPEAL OF J.C., MOTHER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1274 EDA 2017 |

Appeal from the Order Entered March 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-001229-2016,

CP-51-DP-0002539-2015

BEFORE:   BOWES, J., NICHOLS, J., and RANSOM*, J.

MEMORANDUM BY RANSOM, J.:                    **FILED JUNE 25, 2018**

Appellant, J.C. ("Mother"), appeals from the orders entered on March 17, 2017, that terminated her parental rights to her three children: A.J.M., born 2004; R.L.C.-E., born 2012; and G.J.C.-E., born 2013 (collectively, "the Children").  We affirm the orders terminating Mother's parental rights to R.L.C.-E. and G.J.C.-E., but we vacate the order terminating Mother's parental rights to A.J.M. and remand to the trial court for additional proceedings consistent with this decision.[1]  In addition, we specifically direct that these additional proceedings be held within sixty days of the filing of this memorandum.

In July 2013, A.J.M. was adjudicated dependent; in December 2013, the dependency was discharged.[2]  In 2014, A.J.M. was again adjudicated dependent; in June 2015, that dependency was discharged.  In September 2015, A.J.M.'s case was again re-opened, and dependency petitions were filed for R.L.C.-E. and G.J.C.-E.  The Philadelphia Department of Human

---

*   Retired Senior Judge assigned to the Superior Court.

[1] We leave undisturbed the orders finding A.J.M. dependent and establishing A.J.M.'s foster/pre-adoptive placement.

[2] During the hearing on the petitions for involuntary termination of Mother's parental rights, Mother's counsel stipulated to the Children's dependency dockets.  Notes of Testimony (N.T.), 3/17/17, at 51.

Services ("DHS") obtained orders of protective custody for the Children. In October 2015, the Children were adjudicated dependent and committed to the custody of DHS. The Children's permanency goal was reunification with Mother, and DHS implemented a single case plan ("SCP") for Mother. Between September 2015 and February 2016, Mother failed six drug screens, testing positive for marijuana each time. DHS Exs. 11, 15-16, 20-22; Notes of Testimony (N.T.), 3/17/17, at 58 (Mother stipulates to results of drug tests). The Children were in separate foster homes until the trial court ordered the Children to be placed together in April 2016. In December 2016, DHS filed petitions for involuntary termination of Mother's parental rights to the Children.

At the February 2017 permanency review hearing, Mother moved for recusal and for a continuance to allow her counsel to review discovery; the trial court denied both motions. N.T., 2/21/17, at 15-24, 33-34, 126-28, 153, 213-14. The trial court then heard evidence about the Children's placement, based on Mother's allegations that the pre-adoptive foster home was not appropriate and that it was in the best interests of the Children to be moved to their maternal grandmother, L.F. ("Grandmother"). A social worker from the Community Umbrella Agency ("CUA") Asociación Puertorriqueños en Marcha ("APM"), Sommer Sinclair, testified that, in January 2017, when she asked A.J.M. her three wishes, A.J.M. responded "that she can live with her mom" and the Children's foster mother. However, during their last conversation before the February 2017 hearing,

- 3 -

A.J.M. told Ms. Sinclair "that she didn't know anymore" where she wanted to live. Grandmother testified that A.J.M. told her that "she didn't want to be in the foster home anymore. She wanted to come home to her mother." Mother also testified. At the conclusion of the hearing, at DHS's request, the trial court held that Grandmother and Mother were not credible – it did not believe what it "heard."

The trial court entered orders allowing the Children to remain in their current foster home and keeping the permanency goal as reunification with Mother – *i.e.*, the trial court made no change in the Children's permanency goal or placement. The trial court scheduled a termination hearing for March 17, 2017.

On March 13, Mother filed a motion to produce child – specifically, A.J.M. On March 15, the trial court denied this motion.

On March 17, 2017, Mother objected to Ms. Sinclair testifying to matters contained in APM's and DHS's business records; the trial court overruled the objection, based on the worker's personal knowledge of the case. Despite Mother's objection to Ms. Sinclair's testimony regarding the history of the case, Mother subsequently stipulated to all three dependency dockets and the information contained therein, including A.J.M.'s prior adjudications of dependency, the history of the Children's cases, and the results of Mother's drug tests. N.T., 3/17/17, at 48, 51, 58.

Ms. Sinclair testified that Mother's SCP objectives were to obtain housing and employment, to engage in mental health treatment, to

participate in anger management, to complete a parenting capacity evaluation ("PCE"), to comply with drug tests at DHS's clinical evaluation unit ("CEU"), and to comply with all court orders. *Id.* at 59, 63-68, 76-79, 82. Ms. Sinclair added that Mother was aware of her objectives.

During Ms. Sinclair's testimony, Mother requested to leave the courtroom in order to use the restroom. *Id.* at 60. The trial court granted this request but informed Mother that testimony would continue in her absence.

Ms. Sinclair then stated that Mother was given an application for APM's housing and was referred to the Achieving Reunification Center ("ARC") for housing five separate times and to DHS housing multiple times, but she never obtained appropriate housing. *Id.* at 63-66, 122-23. Ms. Sinclair continued that Mother needed employment in order to maintain housing, but, although Mother claimed to be working for a temp agency, she had not provided APM with verification of her employment since April 2016.

Ms. Sinclair also testified about Mother's inconsistent mental health treatment, explaining that Mother did not seek mental health treatment until November 2016. *Id.* at 67-69, 72-78, 81-83, 110-13. Mother had missed fourteen out of forty-eight appointments. Ms. Sinclair added that Mother was referred to ARC numerous times for anger management, but Mother had still not completed her anger management objectives. Mother has threatened her and the staff at Pediatric Specialty Care, after which Mother was no longer allowed to enter the Pediatric Specialty Care building.

Ms. Sinclair stated that Mother missed two appointments to undergo her PCE, which she also never completed.

According to Ms. Sinclair, Mother had "recently" refused to appear for any drug tests under the supervision of CEU. *Id.* at 79-82. However, in November 2016, Mother began drug and alcohol treatment at NET, which required Mother to take drug tests, all of which have been negative. Nevertheless, NET did not inform APM or CEU about how often it performs drug tests, whether Mother had missed any tests, or what Mother's creatinine levels were. CEU had continued to call Mother asking her to take random drug tests at its facility, but she stopped after February 2016. CEU's intention was to schedule three random drug tests with Mother in between each court appearance.

Ms. Sinclair noted that Mother did not make herself available to sign educational documents for the Children, did not attend their educational conferences, and only occasionally attended their medical appointments. *Id.* at 76-78, 83-92, 95-97, 100-05, 124.

Ms. Sinclair asserted that the Children were residing together in an appropriate, loving, safe, permanent, and pre-adoptive foster home and that the Children "have a great relationship with their foster mother," whom they "love." *Id.* at 86-87, 91-100, 104-05, 128, 143-44.

Ms. Sinclair further testified that Mother had weekly visits with the Children late in the evening, at her request. *Id.* at 76-78, 83-85, 95-105, 124. Mother has only been consistent with her visits since September 2016;

she once missed her visits for a month and a half. While Ms. Sinclair or another APM worker supervised the younger children, Mother and Grandmother would interrogate A.J.M. As a result, Mother caused A.J.M. distress and confusion at most visits. At the end of the visit immediately before the March 2017 hearing, Mother upset A.J.M. even more by telling her that it was their last visit. However, Ms. Sinclair admitted that, in the last few weeks before the March 2017 hearing, Mother's interactions with the Children had improved, and Mother read to the Children more often. Nevertheless, according to Ms. Sinclair, "[i]t really depends on what [Mother]'s mood is at that moment." When asked if "there's a positive healthy maternal relationship there," Ms. Sinclair answered, "There's really no interaction."

After Ms. Sinclair's testimony, the trial court inquired about Mother, who had not returned to the courtroom. *Id.* at 162-63. After a recess, Mother's counsel stated that Mother was "out in the waiting area" but did not want to re-enter the courtroom.

Mother's cousin, P.B., then testified that Mother had not obtained appropriate and stable housing. *Id.* at 167-76. P.B. had offered housing to Mother, but Mother did not keep in contact with her.

Mother never returned to the courtroom. *Id.* at 177. Mother's counsel represented that Mother felt "sick," not that she "doesn't want to" return to the courtroom.

During closing arguments, although the guardian *ad litem* acknowledged that A.J.M. was "unable to use the legal jargon that's sometimes required by counsel to put on the record," she still represented that A.J.M. was capable "of articulating the home that she wants to stay in and where she wants to live." *Id.* at 186. The guardian *ad litem* continued:

> [A.J.M.] has a foster parent who she sometimes calls by her first name, but she also calls her mom. She has indicated that that's the home where she wants to stay.
>
> I think that, with [Mother] and [Grandmother] yelling at her and her crying in a corner, . . . it's a really hard time to ask a child, "Okay, so, now what do you want to do?"

*Id.*

At the conclusion of the March 2017 hearing, the trial court entered decrees terminating Mother's parental rights to the Children, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b). In April 2017, Mother filed a motion for reconsideration, propounding that the Children are entitled to a child advocate who will represent their legal interests separate from a Guardian Ad Litem. The trial court never entered an order in response.

In April 2017, Mother filed timely notices of appeal, which this Court consolidated *sua sponte* in May 2017. In August 2017, Mother filed a brief to this Court. In September 2017, DHS filed an application to dismiss Mother's appeals or to strike Mother's brief for failure to comply with the Rules of Appellate Procedure. On October 10, 2017, Mother's brief was

stricken, and we ordered Mother to file a new brief by October 20, 2017; Mother complied.[3]

Mother now raises the following questions on appeal:

[1.] Did the [trial] court consider the [C]hildren's wishes when a) [it] never physically saw the [C]hildren throughout the life of the case, b) denied [M]other's request that [A.J.M.] be brought to Court and c) the [C]hildren were never appointed counsel to represent their legal interests?

2. Did the [trial] court err in permitting witnesses to testify as to the contents of the DHS file as a business record when the file was not present at the hearing nor introduced into evidence[?]

3. Did the [trial] court fully consider all the necessary factors pursuant to the Pennsylvania Juvenile Act, specifically 42 Pa.C.S.[] § 6351(e) & (f), in its determination that the goal of adoption is in the [C]hildren's best interest?

4. Did [DHS] sustain its burden under 23 Pa.C.S.[] § 2511(a)(1), (2), (5) or (8) and 2511(b) that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

[5.] Did the trial court err relying on facts that were never submitted by way of evidence or stipulation?

6. Did the [trial] court err in denying Appellant's motion for continuance pending the outcome of an appeal regarding a prior hearing and/or for mother's counsel to have an appropriate time to review the DHS file that was over 1500 pages?

7. Did the [trial] court err in denying Appellants motion for recusal?

Mother's Brief at 5-6 (issues re-ordered to facilitate disposition) (some formatting applied) (trial court answers omitted). We note that, in the

_____

[3] Hereinafter, "Mother's Brief" shall refer to the brief filed in October 2017.

"Argument" section of her brief, Mother includes no separate argument about the "factors" pursuant to 42 Pa.C.S. § 6351(e)-(f), distinct from her references to Section 6351(e)-(f) in her arguments about the trial court allegedly ignoring the Children's wishes and about the pending appeal. Additionally, Mother makes no argument about why she should have been granted a continuance to review discovery outside of her contention that the trial court's failure to grant this continuance was an example of its bias against her, thereby warranting recusal. Thus, we will only discuss Section 6351(e)-(f) and the trial court's denial of a continuance for review of discovery insofar as they pertain to those other challenges.

We consider Mother's arguments in light of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations, brackets, and quotation marks omitted).

## Consideration of the Children's Wishes

Mother argues that the trial court erred in terminating her parental rights to the Children "as there was no consideration of the Children's wishes with respect thereto." Mother's Brief at 42. In addition, Mother submits that the Children were entitled to be represented by appointed legal counsel, separate from the attorney guardian *ad litem*, pursuant to *In re L.B.M.*, 161 A.3d 172 (Pa. 2017), and that this Court hence should reverse and remand for an appointment of counsel, followed by a *de novo* review of the appropriateness of the permanency goal and termination. Mother's Brief at 20, 43-44, 47-48.

Mother makes no specific arguments as to R.L.C.-E.'s and G.J.C.-E.'s wishes, *id.* at 42-46, and we see nothing on the record suggesting any preference expressed by either of the two younger children. However, Mother alleges that A.J.M. was "of legal age where the [trial] court is required to consider her preference regarding whether she wants to be adopted in this matter," referring to A.J.M.'s "reluctance to be adopted." *Id.* at 42.

In *L.B.M.*, 161 A.3d at 176, in a termination proceeding, a mother filed a motion requesting the appointment of independent counsel for her two children, which the trial court denied. The Supreme Court of Pennsylvania reversed and remanded, holding that the failure to appoint counsel for a child in a contested, involuntary termination of parental rights

proceeding is a structural error. *Id.* at 183. Under this Court's interpretation of *L.B.M.* in *In re D.L.B.*, 166 A.3d 322, 328-29 (Pa. Super. 2017), a guardian *ad litem* may serve as legal counsel for a child in an involuntary termination proceeding so long as the child's legal and best interests are not in conflict.[4]

However, there is no case law as to whether separate representation is necessary when there is the mere potential for conflict, which appears to be the case here. The trial court heard testimony from Ms. Sinclair that A.J.M. originally wanted to live with both Mother and the Children's foster mother; however, A.J.M. later said that she did not know where she wanted to live. N.T., 2/21/17, at 126-28. The guardian *ad litem* stated that A.J.M. sometimes calls the foster mother by her first name and other times calls her, "Mom." N.T., 3/17/17, at 186. She further explained that A.J.M. has indicated to her that she wants to live in the foster home, but she dismissed any contrary feelings A.J.M. has expressed as having been influenced by Mother and Grandmother -- without denying that A.J.M. has communicated inconsistent views about her living arrangements, the termination of Mother's parental rights, and potential adoption by the foster mother. *Id.*[5]

---

[4] "[A] child's legal interests . . . are synonymous with the child's preferred outcome." *L.B.M.*, 161 A.3d at 174.

[5] The trial court also heard Grandmother's testimony that A.J.M. said that she did not want to live in the foster home anymore and wanted to live with

*(Footnote Continued Next Page)*

Thus, the evidence established that A.J.M.'s feelings about termination and adoption were ambivalent. We find no case law providing guidance for a trial court in such situations.

The recent case of *In re Adoption of T.M.L.M.*, ___ A.3d ___, 2018 Pa. Super. 87, 2018 WL 1771194 (filed Apr. 13, 2018), is not dispositive. In *T.M.L.M.*, the guardian *ad litem* never even met with the child and thus "never attempt[ed] to ascertain the client's position directly[.]" *Id.* at *4. There is no suggestion in the current case that the appointed guardian *ad litem* never met with A.J.M. or never **attempted** to ascertain A.J.M.'s position directly. *See* N.T., 3/17/17, at 186. Although A.J.M. had conflicting feelings about termination, the child's inability to articulate a preference does not mean that the guardian *ad litem* did not "attempt[] to ascertain" one. In fact, a child being "unable to articulate a clear position or hav[ing] mixed feelings about the matter" is one of the outcomes contemplated by *T.M.L.M.* *after* an attempt is made to consult the child about his or her preferred outcome. 2018 WL 1771194 at *4. *T.M.L.M.* provides no guidance that counsel must be provided where the outcome of the inquiry is ambivalence.

_____

*(Footnote Continued)* ——————————

Mother. N.T., 2/21/17, at 153. However, the trial court found Grandmother not to be credible, *id.* at 213-14, and we are required to accept the credibility determinations of the trial court. *T.S.M.*, 71 A.3d at 267.

Thus, even though **T.M.L.M.** remanded for the appointment of counsel to advance the child's legal interests, such an outcome is not required here; the fact that the guardian *ad litem* in **T.M.L.M.** never met with the child distinguishes said case from the current one. **T.M.L.M.** hence is inapplicable.

We have therefore realized that we must provide guidance to the trial court as to whether separate legal representation is required when a child's wishes about his or her preferred outcome are ambivalent. As the interests of the child are always paramount, we conclude that, in such situations, separate legal representation must be appointed where the child is old enough to articulate **any** opinion,[6] even an ambivalent one, and where the child is competent to provide some guidance.

"Competency relates to the capacity of the witness to communicate, to observe an event and accurately recall that observation, and to understand the necessity to speak the truth." **Commonwealth v. Walter**, 93 A.3d 442, 451 (Pa. 2014) (citation and internal quotation marks omitted). When there is any concern as to the competence of a child, a hearing must occur to determine the child's competency, similar to a competency hearing for a child witness in a criminal case. **See Commonwealth v. Hutchinson**, 25 A.3d 277, 289-90 (Pa. 2011); **Commonwealth v. Delbridge**, 855 A.2d 27,

_____

[6] For example, an infant who cannot yet speak obviously would not be old enough to have any opinion on his or her permanency goals or placement.

- 14 -

39 (Pa. 2003) (citing Pa.R.E. 601(b)). This concern as to the child's competency may be raised by any party or *sua sponte* by the trial court.[7]

Our guidance that the trial court must consider the child's ability to communicate does not contradict our earlier holding in **In re Adoption of G.K.T.**, 75 A.3d 521 (Pa. Super. 2013). In **G.K.T.**, this Court held that a trial court must appoint counsel to represent a child in a termination of parental rights case even though the child was, due to age, unable to communicate with counsel. **Id.** at 527. However, **G.K.T.** concerned the appointment of counsel to represent the child's best interests, not the child's legal interests. **Id.** An advocate for a child's best interests does not need to be able to communicate with the child, whereas an advocate for a child's legal interests would need to be able to communicate with the child, in order to learn what those interests – *i.e.*, his or her preferred outcome – were. Accordingly, while a competency hearing is unnecessary before a counsel is appointed to represent a child's best interests, such a determination of competency is necessary before the appointment of counsel to represent a child's legal interests. Consequently, we do not overrule nor contradict **G.K.T.**

---

[7] However, we note that competency is presumed for a minor over fourteen years of age. **Hutchinson**, 25 A.3d at 289-90 & n.8 (citing **Commonwealth v. Ali**, 10 A.3d 282, 300 n.1 (Pa. 2010); **Rosche v. McCoy**, 156 A.2d 307, 310 (Pa. 1959)).

Returning to the current action, the evidence has shown that A.J.M. is old enough to communicate an opinion and that she feels ambivalent about Mother's parental rights to her being terminated and about being adopted. Thus, unless DHS, Mother, or the trial court itself request a competency hearing, the trial court must appoint an advocate for A.J.M. in addition to the guardian *ad litem*.[8] If there is any challenge to A.J.M's competency, the trial court must hold a competency hearing. If, following a hearing, A.J.M. is determined to be sufficiently competent to communicate her preferred outcome with an advocate, then a separate advocate must be appointed. If A.J.M. is determined to be incompetent following a hearing, then no additional advocate would be required.

Ergo, we vacate the order terminating Mother's parental rights to A.J.M. and remand to the trial court for additional proceedings consistent with this memorandum – *i.e.*, (1) if no challenge to A.J.M.'s competency, the appointment of a child advocate for A.J.M. separate from the guardian *ad litem*; (2) following a challenge to A.J.M.'s competency, a hearing to determine her competency followed by either (a) a finding of competency, the appointment of a child advocate for A.J.M., and a new hearing on the

_____

[8] A child advocate focused exclusively on A.J.M.'s legal interests may be able to ascertain A.J.M.'s preferred outcome, even where the child expressed uncertainty to the social worker and the guardian *ad litem*.

termination petition[9] or (b) a finding of incompetency and a reinstatement of the existing termination order.

We note that, notwithstanding our vacatur of the trial court's order terminating Mother's parental rights as to A.J.M., we leave undisturbed the order finding A.J.M. dependent and establishing A.J.M.'s foster/pre-adoptive placement. A.J.M. shall not be returned to Mother's home during the period that the trial court resolves the issues pursuant to our remand, unless the trial court orders A.J.M. reunified with Mother, ends court supervision, and/or finds A.J.M. no longer dependent. We note that no party has sought for A.J.M. to be returned at this time, and we therefore conclude that it is in

---

[9] If a new hearing occurs on the termination petition, the trial court does not need to consult with or otherwise interview A.J.M. personally in order to ascertain her views regarding the permanency plan. The child advocate may represent A.J.M.'s preferences to the trial court.

According to 42 Pa.C.S. § 6351(e)(1), which controls permanency hearings:

> In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity. **If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court** by the guardian ad litem under section 6311 (relating to guardian ad litem for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court.

*Id.* (emphasis added).

A.J.M.'s best interests to maintain the *status quo* while the trial court acts on remand.

As we are vacating the order terminating Mother's parental rights to A.J.M., we need not consider any additional issues as to this child.[10] Our remaining analysis hence will focus exclusively on the two other children, R.L.C.-E. and G.J.C.-E.

**DHS File**

Mother contends that she "was denied a fair hearing and due process of law by the [trial] court permitting the social worker to testify from her memory as to the contents of Mother's DHS file." Mother's Brief at 27. However, Mother stipulated to the Children's dependency dockets and all of the information contained therein, including the history of the Children's cases, all court orders, Mother's drug screenings, and A.J.M.'s prior dependency petitions, multiple adjudications of dependency, and supervision by the trial court prior to her current commitment to DHS. N.T., 3/17/17, at 48, 51, 58. Additionally, Ms. Sinclair had personal knowledge of fifteen of the eighteen months that the Children were in care. *See* Pa.R.E. 602. Furthermore, Mother has not directed this Court to any specific instances in which the trial court relied upon facts that were not within Ms. Sinclair's

_____

[10] If the order terminating Mother's parental rights to A.J.M. is reinstated, a new appeal will be required, and another panel of this Court will rule on any issues related to A.J.M.

personal knowledge in making its decision to terminate Mother's parental rights. Mother's Brief at 27-33.[11] For these reasons, Mother's challenge is meritless.

**Termination of Parental Rights**

Next, Mother argues that DHS "failed to establish by clear and convincing evidence the elements of 23 Pa.C.S.[] § 2511(a)(1), (2), (5) or (8)" and "that termination of Mother's parental rights best meets the developmental, physical and emotional needs and welfare of the Children. 23 Pa.C.S.[] Section 2511(b)." Mother's Brief at 33, 40.

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101–2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):

_____

[11] The only example that Mother provides "of why the record is necessary is how the trial court[,] in [its] opinion, finds that in May of 2013 [R.L.C.-E.] was admitted into the hospital because x-rays revealed the child had broken ribs," which Mother contends was later revealed to have been a misdiagnosis. Mother's Brief at 31-32 (citing Trial Court Opinion (TCO), 6/23/17, at 1). Although the trial court did include R.L.C.-E.'s injuries in its "Factual and Procedural Background," nowhere in its analysis of its reasons for decreeing termination did the trial court refer to this alleged injury or to any alleged abuse. TCO, 6/23/17, at 14-26.

determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is on the petitioner seeking termination to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are met. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We will affirm if we agree with the trial court's decision as to any one subsection of 23 Pa.C.S. § 2511(a), and its decision as to § 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

Here, we affirm the trial court's decision to terminate Mother's parental rights as to R.L.C.-E. and G.J.C.-E. under subsections 2511(a)(5) and (b), which provide:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

- 20 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

*Id.* § 2511(a)(5), (b).[12]

It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to do so by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citation omitted). Further,

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citation omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude

---

[12] The trial court also found sufficient evidence with respect to termination under Section 2511(a)(1), (2), and (8). As we affirm the trial court's decision under subsection (a)(5), we need not address Mother's other subsection (a) arguments. *See B.L.W.*, 843 A.2d at 384.

that there is no merit to Mother's claims that DHS failed to establish the elements of 23 Pa.C.S. § 2511(a)-(b). The trial court opinion properly disposes of these questions:

> Mother . . . appeals the trial court's termination of parental rights under 23 Pa. C.S.[] §2511(a)(5), which permits termination when a child was removed, by court or voluntary agreement, and placed with an agency if, for at least six months, the conditions which led to the placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services reasonably available to the parent are not likely to remedy the conditions leading to placement, and termination best serves the child's needs and welfare. DHS, as a child and youth agency, cannot be required to extend services beyond a period of time deemed reasonable by the legislature or be subjected to herculean efforts. . . .
>
> [R.L.C.-E. and G.J.C.-E.] have been in DHS custody since September 2015, eighteen months at the time of the termination trial[.[13]] . . . [R.L.C.-E. and G.J.C.-E.] were placed in care because Mother was unable to parent. Mother's chief obstacle to reunification was her failure to successfully complete all of her SCP objectives. Mother was aware of her objectives. N.T., 3/17/17, at 59. Mother has refused to appear for her court-ordered drug screens at the CEU. Mother is currently enrolled at NET for drug and alcohol treatment, where she has tested negative on her drug screens. However, the frequency of the drug screens and Mother's creatinine levels are unknown since Mother has not provided details of her drug screens. Mother also attends NET for mental health treatment, which only began in November 2016 when she also started her drug and alcohol program. Mother has missed fourteen out of forty-eight mental health appointments; Mother is supposed to be attending three

---

[13] The trial court also noted that A.J.M. had been in DHS custody for twenty-one months at the time of the termination hearing. TCO, 6/23/17, at 20. However, for the reasons explained above, we need not consider any additional facts pertaining to A.J.M.

times each week. Mother's mental health treatment is somewhat inconsistent. *Id.* at 57, 66-68, 78-82.

Mother has not completed her PCE as she missed two appointments to complete the second portion. [Ms. Sinclair] testified that she rescheduled Mother's missed appointments multiple times, but Mother still did not complete the evaluation. Mother is now on a waiting list for an appointment due to missing so many appointments. Mother has difficulty handling her emotions, particularly her anger, as she has threatened [Ms. Sinclair] and had even been banned from entering the Pediatric Specialty Care building[.] . . . [Ms. Sinclair] now has someone with her at visits. Mother is moody, disrespectful, and aggressive. Mother was referred to ARC numerous times for anger management, but Mother still has not completed her anger management objective. *Id.* at 68-69, 72, 74-78, 82-83, 110-13. Mother has not obtained appropriate and stable housing at any point during the life of the case. Mother was referred multiple times to ARC and DHS housing. Mother was also provided the application for APM housing, but Mother did not take advantage of the resources offered. Mother has failed to even take advantage of a housing resource through her maternal [cousin] because Mother does not keep in contact with her. Mother was also referred to ARC for employment. Mother claims to be working at a temp agency, but has not provided CUA with verification of her employment since April 2016. *Id.* at 63-66, 122-23, 167-76.

Mother has weekly supervised visits with [R.L.C.-E. and G.J.C.-E.] in the evening as an accommodation for Mother's work schedule. Mother has attended all of her visits since the last court date. Prior to September 2016, Mother was not consistent with her visits. At one period in time, Mother missed a month and a half of visits.[14] . . . Mother is passive and does not take

_____

[14] The trial court further observed:

During visits, [A.J.M.] is usually ignored and [Grandmother] handles any necessary parental duties, not Mother. . . . In the evenings, when [Ms. Sinclair] is the only supervisor and is watching the younger children, Mother and [Grandmother] will

*(Footnote Continued Next Page)*

redirection well. . . . In the past few weeks, Mother's interactions with [R.L.C.-E. and G.J.C.-E.] have improved; Mother reads to [R.L.C.-E. and G.J.C.-E.] more often when she is in the right mood. *Id.* at 78, 85.

Mother occasionally attends [R.L.C.-E.'s and G.J.C.-E.'s] medical appointments. Mother continues to give CUA difficulty to sign necessary paperwork for care of [R.L.C.-E. and G.J.C.-E.[15]] . . . [R.L.C.-E. and G.J.C.-E.] are in the care of a foster parent who takes care of all of their needs. The trial court always found that DHS made reasonable efforts to reunify [R.L.C.-E. and G.J.C.-E.] with Mother. The trial court also found that Mother was unable to remedy the conditions which led to the [R.L.C.-E.'s and G.J.C.-E.'s] placement within a reasonable amount of time as evidenced by Mother's failure to successfully complete all of her SCP objectives. [R.L.C.-E. and G.J.C.-E.] are in a safe, permanent, and pre-adoptive home. Adoption is in [R.L.C.-E.'s and G.J.C.-E.'s] best interests and they would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 94-96. Mother was given ample time to place herself in a position to parent [R.L.C.-E. and G.J.C.-E.

R.L.C.-E. and G.J.C.-E.] cannot wait for Mother to decide when to be a parent. The conditions which led to the placement of [R.L.C.-E. and G.J.C.-E.] continue to exist, and Mother cannot and will not remedy them within a reasonable amount of time. As a result, the trial court found that termination of Mother's parental rights would be in the best interests of [R.L.C.-E.'s and G.J.C.-E.'s] physical, intellectual, moral, and emotional well-

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

interrogate [A.J.M.] inappropriately about where she wants to live. As a result, Mother causes [A.J.M.] distress at most visits.

TCO, 6/23/17, at 20 (citing N.T., 3/17/17, at 85, 96-97, 105); *accord id.* at 24 (citing N.T., 3/17/17, at 78, 85, 95-97, 105). Nevertheless, again, we need not concern ourselves with facts exclusively relating to A.J.M.

[15] During the termination hearing, only A.J.M. was referred to as "school-aged." N.T., 3/17/17, at 86. Thus, the analysis by the trial court that "Mother does not make herself available to sign educational documents for the Children, and does not attend their educational conferences" appears to apply only to A.J.M. TCO, 6/23/17, at 20 (citing N.T., 3/17/17, at 76-78, 83-92, 95-97, 100-03, 105, 124).

being. The trial court made this determination on the basis of clear and convincing evidence, so termination under this section was proper. . . .

After finding of any grounds for termination under section (a), the court must, under 23 Pa. C.S.[] § 2511(b), also consider what – if any – bond exists between parent and child. . . . Mother has attended all of her weekly supervised visits since the last court date. Mother only became consistent with her visits as of September 2016. Prior to that time, Mother was inconsistent, even missing an entire month and a half of visits at one point. Mother does not usually play or interact with [R.L.C.-E. and G.J.C.-E.] appropriately during visits. Mother is passive and leaves the parenting to [Grandmother]. . . . [Ms. Sinclair] testified that Mother's interactions with [R.L.C.-E. and G.J.C.-E.] have improved during the last few weeks and Mother reads to [R.L.C.-E. and G.J.C.-E.] more often when she is in the mood. [R.L.C.-E. and G.J.C.-E.] are in a safe, permanent, and pre-adoptive home. [R.L.C.-E. and G.J.C.-E.] have a great relationship with the foster parent. . . . [R.L.C.-E. and G.J.C.-E.] call the foster parent "Mom[.]" . . . Mother does not have a parental or maternal bond with [R.L.C.-E. and G.J.C.-E.] *Id.* at 76-78, 83-105, 124, 128, 143-44. [Ms. Sinclair] testified that adoption is in [R.L.C.-E.'s and G.J.C.-E.'s] best interests and that they would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 94-96. The DHS witness was credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

Trial Court Opinion (TCO), 6/23/17, at 19-21, 23-24 (some formatting added). Accordingly, for Mother's claim that DHS did not meet its burden of proof for termination of her parental rights, we affirm on the basis of the trial court opinion for R.L.C.-E. and G.J.C.-E.

### Reliance on Facts Not in Evidence

Mother argues that the trial court "erred in basing its decision on facts not introduced into evidence." Mother's Brief at 22. Specifically, Mother

- 25 -

maintains that the trial court opinion "in its 'Factual and Procedural Background' found facts that were not submitted to the court but appear to be only stated in allegation attachments to the DHS 2015 Petitions for Adjudication as well as to the petitions for Goal Change and Termination of Parental Rights." *Id.*

In its analysis for Section 2511(a)(5) and (b), quoted in its entirety above, the trial court did not rely upon any source of evidence besides the testimony presented during the hearing on March 17, 2017. That hearing was specifically on DHS's petitions for termination of parental rights. Thus, contrary to Mother's allegation, the trial court did not base its decision to terminate Mother's parental rights on any facts not introduced into evidence.

**Pending Appeal**

Mother contends that the trial court should have stayed the termination of parental rights proceedings pending her appeal of an order entered in the dependency proceedings on February 17, 2017.[16] Mother's Brief at 60.

In *In re R.P.*, 958 A.2d 449 (Pa. Super. 2008), a mother appealed from dependency orders and, while the appeal was pending, the trial court entered an order changing the placement goal for the Children. We held

_____

[16] Docket Numbers 931 EDA 2017, 932 EDA 2017, 933 EDA 2017, 1033 EDA 2017, 1034 EDA 2017, and 1035 EDA 2017.

- 26 -

that the pendency of the appeal did not divest the trial court of jurisdiction nor otherwise prevent it from entering a goal change order. We stated that the statutory mandate of the Juvenile Act vested a trial court with broad discretion to act consistently in protecting the physical, mental, and moral welfare of children notwithstanding the pendency of an appeal from previous orders and judgments. *Id.* at 454 (citing 42 Pa.C.S. § 6351(e)(3)(ii)(A)). This Court also asserted that, due to the time needed for appellate review, all hearings should continue while an appeal is pending. *Id.* at 453-54 (citing *In re H.S.W.C.-B.*, 836 A.2d 908 (Pa. 2003)). A stay should not be ordered, nor proceedings halted pending the appeal. *Id.*

> A holding that deprives [the trial c]ourt of jurisdiction merely because a single Order, involving any issue or party, has been appealed would not only defy logic, but it would also frustrate the statutory authority of [the trial c]ourt to exercise continuing independent and original authority to adjudicate in the best interests of a dependent child.

*Id.* at 453 (citations omitted).

Here, although Mother was not appealing orders finding the Children dependent but permanency review orders, the analysis of *R.P.*, 958 A.2d 449, is still applicable to the current appeal, and the pendency of Mother's appeal would not divest the trial court of jurisdiction nor otherwise prevent it from entering a termination order. The trial court was compelled to exercise continuing independent and original authority to adjudicate in the best interests of the Children. *Id.* at 453.

- 27 -

## Recusal

Finally, Mother argues that the trial court committed an error of law and abuse of discretion in denying her request for recusal. Mother's Brief at 51.

"The propriety of a judge's decision on a motion for recusal is reviewed on appeal under an abuse of discretion standard." ***Randt v. Abex Corp.***, 671 A.2d 228, 235 (Pa. Super. 1996). "If the cause is appealed, the record is before the appellate court which can determine whether a fair and impartial trial were had. *If so, the alleged disqualifying factors of the trial judge become moot.*" ***Commonwealth v. Urrutia***, 653 A.2d 706, 711 (Pa. Super. 1995) (emphasis in original) (citation omitted). "[S]imply because a judge rules against [party] does not establish any bias on the part of the judge against that [party]." ***Commonwealth v. Travaglia***, 661 A.2d 352, 367 (Pa. 1995).

Mother urges us to find that the trial court improperly "made a determination of [Mother's] credibility" prior to the March 2017 hearing: "At the end of the [February 2017 hearing], . . . the [trial c]ourt made a specific finding that [Mother] and [G]randmother were not credible." Mother's Brief at 51; ***see also id.*** at 57.

The trial court's finding that Mother and Grandmother were not credible was retrospective. N.T., 2/21/17, at 213-14. The trial court repeatedly stated that it did not believe "the stories" and "the testimony" it

"**heard**." For its credibility determination, the trial court refers to Mother's testimony in the past tense; there is no suggestion in the record that the trial court's credibility determination was prospective – *i.e.*, that it would not accept the veracity of any of Mother's future testimony. Furthermore, whether the trial court would have found any testimony from Mother after February 2017 to be credible is moot, because Mother chose not to testify at the termination of parental rights hearing in March 2017, preferring to stay outside the courtroom. N.T., 3/17/17, at 60, 162-63, 177.

Mother also insists that the trial court should have granted her request for recusal in order to avoid the appearance of bias or ill will. Mother's Brief at 52. When a party requests that a trial judge recuse himself the jurist must make a conscientious determination of his ability to assess the case in an impartial manner and whether his continued involvement in the case would create an appearance of impropriety or tend to undermine public confidence in the judiciary. ***Commonwealth v. Kearney***, 92 A.3d 51, 61 (Pa. Super. 2014). Here, the trial court conducted a self-assessment and decided that it remained free of personal bias or interest in the outcome at all times. TCO, 5/30/17, at 10-14. We have reviewed the records of the dependency and termination proceedings conducted by the trial court, and we agree that these proceedings were fair in all respects. The trial court did not limit Mother's opportunities to call witnesses or to cross-examine those called by DHS. Moreover, the trial court's rulings throughout the

proceedings reflect no partiality towards either party. The trial court's decisions to maintain the same court placement and to keep the Children in their pre-adoptive foster home then to grant termination are not, in and of themselves, evidence of bias or partiality. *Travaglia*, 661 A.2d at 367.

Mother directs our attention to eleven alleged irregularities in the proceedings, including the trial court's refusal to grant a continuance to allow her counsel to review discovery. Mother's Brief at 53-57. However, since we have reviewed the record and determined that a fair and impartial trial was had, these alleged disqualifying factors become moot. *Urrutia*, 653 A.2d at 711. Thus, we conclude that no basis exists to grant relief to Mother.

* * *

We recognize that this decision leaves this family in a fractured state, and we are aware that the ultimate outcome might be the same – *i.e.*, Mother's parental rights to A.J.M. may eventually be terminated. Nonetheless, we must "ensure that the needs and welfare of [A.J.M.] are actively advanced," which was the aim of *L.B.M.* in requiring the appointment of counsel to service a child's legal interests. 161 A.3d at 180.

Affirmed in part. Vacated in part. Case remanded in part with instructions. Jurisdiction relinquished.

Judge Bowes concurs in the result.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/25/18