958 A.2d 446

LAWRENCE DENIKE, INDIVIDUALLY AND AS A MEMBER OF CLASSIC MORTGAGE, LLC, A NEW JERSEY LIMITED LIABILITY COMPANY, PLAINTIFF–RESPONDENT, v. MICHAEL CUPO, DEFENDANT–APPELLANT.

Argued May 6, 2008—Decided September 24, 2008.

James F. Keegan argued the cause for appellant (*Bendit Weinstock*, attorneys; *Mr. Keegan*, *Barrett F. Kalb* and *Sherri Davis Fowler*, on the briefs).

*Thomas J. Herten* argued the cause for respondent (*Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt & Harz*, attorneys; *Mr. Herten* and *Daniel Y. Gielchinsky*, on the brief).

Chief Justice RABNER delivered the opinion of the Court.

The Judiciary derives its authority from the State Constitution but earns the public's confidence through acts of unquestioned integrity. When that trust is shaken—even slightly—our system of justice falters. To guard against that outcome, we now address an area fraught with peril: a sitting judge's exploration of future employment opportunities.

In this case, a lawyer approached a trial judge and asked if he would consider affiliating with the attorney's firm upon retirement. In response, the judge began preliminary negotiations with the lawyer. Throughout the brief period of their discussions, the lawyer was handling a contested, pending matter before the judge.

That behavior plainly violated *RPC* 1.12(c), which directs that a judge "shall not negotiate for employment with any person who is involved as a party or as an attorney for a party in a matter in

which the [judge] is participating personally and substantially." The attorney should have waited a reasonable period of time after the case ended before broaching the subject of employment. Absent such a break in time, the trial judge should have halted discussions immediately, disclosed them on the record, and allowed the parties to evaluate the need for any further relief.

Judges must avoid actual conflicts as well as the appearance of impropriety to promote confidence in the integrity and impartiality of the Judiciary. Unfortunately, the negotiations between trial judge and lawyer in this case created an appearance of impropriety. Stated simply, the conduct here fell short of the high standards demanded of judges and fellow members of the legal profession and had the capacity to erode the public's trust.

Because any lesser remedy would allow reasonable doubts to linger about the fairness of the outcome of the case, we reverse the judgment of the Appellate Division and remand for a new trial.

## I.

Plaintiff Lawrence DeNike and defendant Michael Cupo were the sole members of Classic Mortgage, LLC (Classic), a company that brokered residential mortgages. They operated the business for a number of years and eventually had a falling out. After they tried unsuccessfully to mediate their dispute, DeNike filed a lawsuit in July 2003 seeking to terminate and acquire Cupo's interest in the company. Cupo counterclaimed. Both parties sought primarily the same relief: calculation of the fair value of Cupo's interest in Classic so that DeNike could buy out Cupo's interest.

The Honorable Gerald C. Escala, then Judge of the Superior Court and Presiding Judge of the Chancery Division, oversaw two-and-a-half years of hard-fought litigation in this matter. DeNike retained Thomas J. Herten, of the law firm Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt & Harz, to represent him.

About two weeks after the lawsuit started, the trial judge issued an order directing that: (1) Cupo be deemed dissociated from Classic as of July 18, 2003; and (2) DeNike make a partial payment of $250,000 to Cupo without prejudice to a final ruling on the value of his interest in the company. The trial judge later set December 31, 2002 as the valuation date for calculating Cupo's interest.

After a five-day bench trial in February and March 2005, the trial judge made various factual findings and ruled that DeNike would acquire Cupo's interest at fair market value. The court rejected each side's valuation expert and appointed William Morrison to calculate the value of Cupo's interest. To do so, Morrison would have to determine the value of the business and make intricate adjustments for commissions received, overhead costs, monthly management fees due DeNike, and the $250,000 payment, among other items. Morrison would also have to recalculate and adjust the parties' capital accounts.

Months later, in December 2005, Morrison testified about his findings, subject to cross-examination. The trial court then issued a supplemental decision directing DeNike to purchase Cupo's interest in Classic for the net amount of $436,682.

As directed, DeNike submitted a proposed form of order on January 3, 2006; Cupo objected and submitted his own proposed order. Specifically, Cupo requested that judgment be entered against DeNike both individually and in his capacity as a member of Classic, jointly and severally; that DeNike not be permitted to pay in installments over five years; and that the court address whether it had considered a $98,530 adjustment for taxes Cupo reportedly paid, on monies he would no longer receive because of an adjustment to his capital account. Cupo also argued that the net amount due him was $493,271, not $436,682, relying on a different figure Morrison had used to adjust the capital accounts.

On January 11, 2006, the court entered an order affirming that $436,682 was owed to Cupo. The following day, the court invited both parties to submit motions to address the error Cupo had

raised about the net amount due as well as the proper payment schedule. Both parties filed motions, and the court issued its second supplemental decision on January 20, 2006. In that ruling, the trial judge agreed with Cupo and noted that it erred regarding the expert's calculations. As a result, Cupo was due $493,271. As for the manner of payment, the court ruled that a five-year payment period was appropriate, and that the obligation belonged to the company, not DeNike individually.

On January 24, 2006, one day after receiving a copy of the court's latest decision, DeNike's attorney, Thomas Herten, visited Judge Escala in chambers and asked about his retirement plans. (We rely on a certification Herten later submitted to the court for that fact and the related statements that follow.) Herten was aware of Judge Escala's mandatory retirement date of February 24, 2006, and asked whether he would consider joining Herten's law firm. The judge replied that he was open to considering the firm but wanted an independent "of counsel" type relationship. Because of the expenses involved in such a relationship, Herten responded that he would discuss the matter with his partners.

Herten met with his partners the next day, January 25, and they agreed to investigate the potential overhead costs of Judge Escala joining the firm. Either that same day or the next, Herten spoke with the judge by telephone and told him it would probably take several days to analyze the projected overhead expenses and get back to him.

Meanwhile on January 26, 2006, Cupo submitted a proposed form of order and promissory note as directed by the trial judge's January 20 second supplemental decision. In a cover letter, Cupo also sought to raise two issues about the promissory note, which the second supplemental decision had addressed. First, while the decision and draft promissory notes provided for annual payments at the judgment rate set by *Rule* 4:42–11, Cupo argued for quarterly installments with interest at the prime rate, based on the company's Operating Agreement. Second, Cupo once again

asked the court to address the $98,530 adjustment for taxes Cupo claimed he had already paid.

Five days later, on January 31, 2006, DeNike's counsel objected and submitted an alternate proposed order and note. Herten wrote that Cupo's proposed forms "greatly exceed the scope of Your Honor's Second Supplemental Decision dated January 20, 2006 and the terms of the [LLC's] Operating Agreement." In particular, Herten complained that "[v]arious terms of the proposed Promissory Note ... are so unilateral that the proposed note would never be executed in a negotiated transaction." According to Herten, those "terms are either not provided for in the Operating Agreement, or directly contrary to the terms of the Operating Agreement." Herten asked the judge to exercise his "discretion to execute the enclosed Order" instead.

The dueling sets of forms had certain apparent differences. Cupo's proposed order allowed for the option of one lump sum payment or payment in installments, while DeNike's provided for installment payments only. Regarding the promissory notes, among other points, Cupo's called for a five percent late fee on payments more than fifteen days late, and DeNike's did not; Cupo's allowed the note to be accelerated and become immediately due and payable if any payment was thirty days late, while DeNike's provided for written notice and an opportunity to cure a default within fifteen days; and Cupo's allowed the note to be assigned, while DeNike's expressly prohibited assignment.

On February 1, 2006, the judge adopted DeNike's proposed form of order and modified it in two ways: (1) he directed Classic to deliver "a promissory note" to Cupo within ten days but declined to endorse either note the parties had submitted; and (2) he inserted a handwritten paragraph explaining that he set the interest rate at the judgment rate "to recognize the effect of the 'advance' payment of $250,000 ... and the fact that the matter was litigated." By signing the order, the court denied Cupo's motion to award the additional amount of $98,530.

Later that same day, after receiving a copy of the final judgment, Herten spoke with Judge Escala by telephone. Herten told the judge the firm had not completed its analysis but that whatever financial arrangement the firm proposed could be adjusted later to insure that it was satisfactory to both sides.

Two days after, on February 3, 2006, Herten visited Judge Escala in his chambers, and the two agreed in principle to the judge joining the firm. They left the financial terms to be determined in the future. At a retirement dinner that night, Judge Escala announced his intention to join Herten Burstein upon retirement. He joined the firm on February 27, 2006.

After learning of Judge Escala's announcement, Cupo moved to vacate the final judgment and sought a new trial. Cupo questioned the judge's conduct in negotiating with the Herten firm and claimed the relationship could have influenced the outcome of the case.

By this time, the case had been transferred from Bergen to Passaic County, where the Assignment Judge assigned the matter to himself. Before ruling on the motion, the Assignment Judge invited Cupo to seek reconsideration of any issue that might properly have been raised before Judge Escala. The Assignment Judge also granted Cupo the opportunity to cross-examine Herten and, if necessary, to question Judge Escala. Cupo declined both offers, and neither party sought reconsideration of the final judgment.

The Assignment Judge recounted the lengthy history of the case and remarked to Herten that, "in retrospect, had you thought it out, you could have handled it a lot more delicately.... You created the situation, and now it snowballed into something that appears to have some impropriety to it." The Assignment Judge added that it would have been a better exercise of discretion if Herten had waited to approach Judge Escala and if the judge had immediately disclosed his conversations with Herten. "[H]indsight being 20/20," the Assignment Judge observed, the trial judge "should have done it differently." Nonetheless, the Assignment

Judge found that the conduct did not violate any canon of ethics, noting that the only task remaining for the court after negotiations had begun was the "ministerial act of formalizing in a written Order that which was decided" earlier. As a result, the Assignment Judge denied Cupo's motion to vacate the judgment.

Cupo appealed, and the Appellate Division affirmed the Assignment Judge's denial of the motion to vacate judgment. *DeNike v. Cupo*, 394 *N.J.Super.* 357, 926 *A.*2d 869 (App.Div.2007). Echoing the Assignment Judge, the panel found that Judge Escala "should not have begun negotiations with the Herten firm before completely concluding this matter, and minimally should have revealed to defendant the contact that was made by plaintiff's attorney as soon as it occurred." *Id.* at 376, 926 *A.*2d 869. However, the panel concluded that "there was no actual appearance of impropriety" and that "[n]o person could reasonably believe that the judge had been biased, less than impartial, or unfair in conducting this trial." *Id.* at 373, 926 *A.*2d 869.

In making that determination, the Appellate Division rejected Advisory Opinion No. 84 of the Committee on Codes of Conduct—which provides that a "judge should not explore employment opportunities with a law firm which has appeared before the judge until the passage of a reasonable interval"—finding it pertains only to federal judges. *Id.* at 373–74, 926 *A.*2d 869. The panel also distinguished *Pepsico, Inc. v. McMillen*, 764 *F.*2d 458 (7th Cir.1985), because it involved employment negotiations that occurred prior to trial. *DeNike, supra*, 394 *N.J.Super.* at 374, 926 *A.*2d 869.

The Appellate Division also focused on Judge Escala's actions in the case after he started negotiating with Herten. The panel found that those negotiations occurred after the trial judge had issued his second supplemental decision and rendered all substantive decisions in the case. *Id.* at 374–76, 926 *A.*2d 869. The only task remaining for the judge, according to the panel, "was the ministerial act of adopting the form order drafted by plaintiff's attorney with only a few minor editorial changes." *Id.* at 375, 926

A.2d 869. In doing so, the judge refused to endorse either form of promissory note before him. *Id.* at 374, 926 *A.*2d 869.

In the end, the panel agreed that Judge Escala "should have handled this situation differently," but noted that "[i]f there is to be any ... regulatory restriction [on post-retirement employment], it must come from the Supreme Court." *Id.* at 375, 926 *A.*2d 869.

In the remainder of its opinion, the Appellate Division addressed various other issues, affirming in part, reversing in part, and remanding in part. In short, the panel concluded that, pursuant to *N.J.S.A.* 42:2B–39, the correct valuation date was July 18, 2003, the date Cupo was deemed dissociated from Classic, and not December 31, 2002, *DeNike, supra,* 394 *N.J.Super.* at 381, 926 *A.*2d 869; that the trial court properly valued Cupo's interest, *id.* at 382–83, 387, 926 *A.*2d 869; and that the trial court did not err in equalizing the parties' capital accounts, *id.* at 384, 926 *A.*2d 869, denying Cupo a credit for taxes paid, *id.* at 385, 926 *A.*2d 869, denying prejudgment interest to Cupo, *id.* at 385–86, 926 *A.*2d 869, or allowing payments to be made over a period of five years, *id.* at 386, 926 *A.*2d 869. The panel deferred to the trial judge's credibility findings in reaching its decision. *Id.* at 383–84, 926 *A.*2d 869.

We granted Cupo's petition for certification. 192 *N.J.* 598, 934 *A.*2d 640 (2007).

## II.

Cupo argues that Judge Escala created an appearance of impropriety by negotiating for employment with Herten; that litigants and the public might be concerned that bias infected the court's decisions; that the Appellate Division failed to distinguish between actual and apparent impropriety; that established principles of New Jersey law, including *RPC* 1.12(c), prohibited the trial judge from having employment discussions with Herten while the case was pending; and that after negotiations had begun, there were still unfinished tasks requiring the exercise of Judge Escala's

discretion. Cupo maintains that because the negotiations provide fair reason to question the trial judge's objectivity and fairness, a new trial is warranted.

Conversely, DeNike argues that the Appellate Division correctly found there was no appearance of impropriety; that the negotiations took place only after the court completed all substantive decisions; that the execution of a final judgment was but a ministerial act; that federal law and advisory opinions are inapplicable; that Cupo's position is based on speculation and subjective beliefs; and that any limitations on post-retirement employment negotiations imposed by this Court should only be applied prospectively.

### III.

Certain core, ethical precepts provide the proper backdrop to this case. They include the bedrock principle articulated in Canon 1 of the *Code of Judicial Conduct* that "[a]n independent and honorable judiciary is indispensable to justice in our society." To that end, judges are required to maintain, enforce, and observe "high standards of conduct so that the integrity and independence of the judiciary may be preserved." *Ibid.*

Judges are to "act at all times in a manner that promotes public confidence," *id.* Canon 2(A), and "must avoid all impropriety *and* appearance of impropriety," *id.* commentary on Canon 2 (emphasis added). Indeed, as this Court recognized nearly a half century ago, " 'justice must satisfy the appearance of justice.' " *State v. Deutsch,* 34 *N.J.* 190, 206, 168 *A.2d* 12 (1961) (quoting *Offutt v. United States,* 348 *U.S.* 11, 14, 75 *S.Ct.* 11, 13, 99 *L.Ed.* 11, 16 (1954)). That standard requires judges to "refrain ... from sitting in any causes where their objectivity and impartiality may fairly be brought into question." *Ibid.* In other words, judges must avoid acting in a biased way or in a manner that may be *perceived* as partial. To demand any less would invite questions about the impartiality of the justice system and thereby "threaten[ ] the integrity of our judicial process." *State v. Tucker,* 264

*N.J.Super.* 549, 554, 625 *A.*2d 34 (App.Div.1993), *certif. denied,* 135 *N.J.* 468, 640 *A.*2d 850 (1994).

### A.

 *Rule* 1:18 obligates every judge to abide by the *Rules of Professional Conduct* and the *Code of Judicial Conduct. See also R.* 1:14. We start with the *Rules of Professional Conduct,* which contain straightforward guidance applicable to this case. *RPC* 1.12(c) provides:

> A lawyer shall not negotiate for employment with any person who is involved as a party or as an attorney for a party in a matter in which the lawyer is participating personally and substantially as a judge or other adjudicative officer, arbitrator, mediator, or other third-party neutral.

The rule is clearer still when its focus is placed only on judges: A *judge* shall not negotiate for employment with any person who is involved as a party or as an attorney for a party in a matter in which the *judge* is participating personally and substantially.

There is no room for dispute that by overseeing the lengthy litigation in this matter, Judge Escala was participating "personally." DeNike argues that after employment negotiations began, the judge's actions were purely ministerial, and by inference not "substantial." All that remained, DeNike contends, was the non-discretionary act of entering a final judgment in the case.

To be sure, in certain instances, entry of judgment may constitute a ministerial act that does not involve the exercise of discretion. *See Parker v. Parker,* 128 *N.J.Super.* 230, 232–33, 319 *A.*2d 750 (App.Div.1974) (noting that entry of judgment was non-discretionary when trial judge made definitive adjudication of controversy, granted parties divorce, and plaintiff died before judgment was formally entered); *see also Fazilat v. Feldstein,* 180 *N.J.* 74, 81–82, 848 *A.*2d 761 (2004) (commenting that trial court in *Black v. Walker,* 295 *N.J.Super.* 244, 252, 684 *A.*2d 1011 (App.Div.1996), entered order against decedent's estate "likely because all but the ministerial act of executing the order had been carried out" before his death).

Here, though, the facts do not support the principle DeNike advances. After January 24, 2006, when Herten broached the topic of employment with Judge Escala, the parties were still at odds over the terms of the final order. As detailed above in section I, the parties submitted dueling forms of order, each with its own, distinct promissory note. The notes differed as to late fees, default provisions, assignability, and other terms. In addition, Cupo's submission raised questions about quarterly installments and the interest rate to be used. Herten's order was accompanied by a cover letter to Judge Escala dated January 31—a week after employment negotiations began—in which Herten asked the judge to reject Cupo's submission and exercise "discretion" to execute Herten's order.

Judge Escala did just that. He also explained in writing why he adopted the post-judgment rate of interest, which Cupo had challenged days earlier. While the trial judge chose not to endorse either promissory note, by doing so he effectively heeded Herten's request not to use his adversary's form.

One could argue that entry of an uncontested form of judgment, after a final, definitive ruling in a case, does not constitute "substantial" participation at the time the order is entered. But when a court explains a prior ruling while deciding between competing submissions and positions, it is still "substantially" engaged. As a result, the discussions between Judge Escala and Herten that began on January 24, 2006 violated the express terms of *RPC* 1.12(c).

## B.

Other rules that address the subject of disqualification reinforce our conclusion that it was error for the trial judge and plaintiff's counsel to engage in employment discussions while the instant litigation was still pending.

Canon 3(C)(1) of the *Code of Judicial Conduct* provides that "[a] judge should disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned." Simi-

larly, *Rule* 1:12–1(f) directs judges not to sit in any matter "when there is any . . . reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so."

■ We agree with the Assignment Judge and the Appellate Division that no evidence in the record shows Judge Escala conducted the trial or post-trial proceedings in a biased or unfair way. To be clear, though, "it is not necessary to prove actual prejudice on the part of the court" to establish an appearance of impropriety; an "objectively reasonable" belief that the proceedings were unfair is sufficient. *State v. Marshall*, 148 *N.J.* 89, 279, 690 *A.*2d 1, *cert. denied*, 522 *U.S.* 850, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997).

■ Those principles give rise to the following standard: Would a reasonable, fully informed person have doubts about the judge's impartiality? We believe so for a number of reasons. First, based on the timing of the negotiations toward the close of the case, an objective observer might reasonably wonder whether Judge Escala favored the Herten firm either consciously or unconsciously. That concern would not be present had the negotiations started a reasonable period of time after the case ended. Because discussions began just days after the second supplemental decision, and in the midst of arguments over the shape of the final judgment, the public has reason to lack confidence in the integrity of the process and its outcome. Second, a judge simply cannot have a prospective financial relationship with one party and expect to persuade the other, or the public, that the court can nevertheless fairly assess the case. *See Pepsico, supra*, 764 *F.*2d at 461 (finding appearance of partiality requiring recusal when headhunter mistakenly contacted parties, on behalf of federal trial judge, before trial was to begin). Indeed, *any* sort of employment negotiations with a party—"preliminary, tentative, indirect, unintentional, [or] ultimately unsuccessful"—right before or during a pending matter, reasonably call into question a judge's impartiality. *Ibid.* Instead of pursuing Herten's entreaty, Judge Escala

should have put an immediate halt to the first conversation and disclosed it on the record.

DeNike, once again, argues that no reasonable person could question the proceedings because as of January 24, 2006, the case had been fully resolved with only ministerial acts left to be addressed. But, as discussed previously, the record reveals otherwise. In addition, the timing of Herten's approach—so soon after the court's January 20 ruling, in a matter that spanned two-and-one-half years of intensely fought litigation—invites doubts about the trial judge's partiality. *See In re Continental Airlines Corp.,* 901 *F.*2d 1259, 1262 (5th Cir.1990) (finding that close coupling of trial judge's rulings—from May 8 through July 1, 1986—with party's employment offer on July 2, 1986 and judge's acceptance on July 29, 1986, created appearance issues warranting recusal).

Accordingly, we find that Judge Escala and Herten's employment discussions on and after January 24, 2006 created an appearance of impropriety that required disqualification under Canon 3(C)(1) and *Rule* 1:12–1(f). This additional, alternative finding in no way undermines our conclusion regarding *RPC* 1.12(c), which prohibited negotiations outright in this case. That said, we find no support in the record for Cupo's claim that Judge Escala should have recused himself before the January 24, 2006 conversation.

## IV.

What, then, is the appropriate remedy? The Appellate Division ordered a revised valuation of Cupo's interest to take into account a new valuation date of July 18, 2003. That task alone requires additional expert analysis and testimony. But more is needed to restore public confidence in the outcome of this case.

During the course of the five-day trial and other proceedings, Judge Escala was required to make various credibility determinations and judgment calls. While there is no evidence that he acted out of actual bias in favor of the Herten firm, the appearance of impropriety generated by the employment negotiations and the

prospect of a financial relationship raises doubts about those decisions and the judge's impartiality in general. Permitting Cupo to cross-examine Herten or question Judge Escala would not sufficiently erase those concerns.

Regrettably, from the standpoint of a knowledgeable, objective observer, the brief negotiations toward the end of the litigation could reasonably have infected all that occurred beforehand. As a result, a full retrial is required to restore public confidence in the integrity and impartiality of the proceedings, to resolve the dispute in particular, and to promote generally the administration of justice. To shorten the proceedings and save resources at the retrial, the parties are encouraged to stipulate to the introduction of any evidence, documentary or testimonial, presented during the first trial.

DeNike contends that it would be unreasonable to apply new ethical restrictions to him retroactively. We do not agree. Because we rely on existing rules and prohibitions set forth in *RPC* 1.12(c), Canon 3(C)(1), and *Rule* 1:12–1(f), the relief ordered properly applies to this case.

## V.

All New Jersey judges face mandatory retirement at age seventy, *see N.J. Const.* art. VI, § 6, ¶ 3, and many choose to practice law in the private sector when they retire from public service, subject, of course, to the *Guidelines on the Practice of Law by Retired Judges,* Administrative Directive # 5–08 (March 24, 2008), *available at* www.judiciary.state.nj.us/directive/2008/dir_05_08.pdf. Because of the importance and sensitivity of questions regarding post-retirement employment discussions, some additional guidance may be helpful.

1. To reiterate, under *RPC* 1.12(c), judges may not discuss or negotiate for employment with any parties or attorneys involved in a matter in which the judge is participating personally and substantially. Similarly, lawyers may not approach a judge to

discuss post-retirement employment while such a matter is pending. If the subject is raised in any fashion, judges should put a halt to the conversation at once, rebuff any offer, and disclose what occurred on the record. The judge and all parties can then evaluate objectively whether any further relief is needed.

2. Judges who engage in retirement discussions while still on the bench—with attorneys who do not have a matter pending before them—must proceed in a way that minimizes the need for disqualification and upholds the integrity of the courts. Just as judges are required to manage their financial and business dealings to avoid conflicts and divest themselves of investments that "could reasonably . . . require frequent disqualification," *Code of Judicial Conduct*, Canon 5(D)(3), they should proceed likewise with employment discussions. To that end, judges should delay starting any discussions until shortly before their planned retirement, and should discuss post-retirement employment opportunities with the fewest possible number of prospective employers. That approach would cause the least amount of disruption to litigants, other judges called upon to handle transferred cases, and the administration of the justice system. We encourage judges to consult with the Assignment Judge or other supervisory judicial officers in this regard.

3. To avoid raising reasonable questions about their impartiality, judges must disqualify themselves from matters involving parties or attorneys with whom they have discussed future employment. *See id.* Canon 3(C)(1); *Rule* 1:12–1(f). For the sake of public confidence, that rule applies with equal force when discussions lead to a future relationship *and* when they do not.

4. Judges should wait a reasonable period of time before discussing employment with an attorney or law firm that has appeared before the judge. As in other areas, what is "reasonable" depends on the circumstances. At one end of the spectrum, an uncontested matter resolved swiftly by entry of a default judgment would not call for a lengthy interval of time. Toward

the other end, prolonged or particularly acrimonious litigation would caution in favor of a longer delay. Actions likely to result in continuing post-judgment matters would also warrant a lengthier intervening period of time.

Obviously, the safest course for judges who wish to avoid overstepping any boundaries or raising an appearance of impropriety would be to wait until after retirement to seek employment. But our rules do not require that approach, and we recognize it can be impractical for various personal and professional reasons. We also recognize that this important subject would benefit from further study and additional, practical guidance. Accordingly, we refer the matter to the Professional Responsibility Rules Committee and the Advisory Committee on Extrajudicial Activities for their recommendations. We ask the Committees to coordinate their efforts.

Advisory Opinion No. 84 of the federal Committee on Codes of Conduct, entitled Judge's Pursuit of Post–Judicial Employment, provides a sensible starting point. That Opinion is binding on federal but not state judges. In reviewing the Opinion, the Committees should consider relevant differences between the federal and state judiciaries. For example, federal judges are appointed for life. *U.S. Const. art.* III, § 1. They may retire with full benefits upon reaching age sixty-five (or older, depending on years of service on the bench), or opt for senior status and continue serving indefinitely. 28 *U.S.C.A.* § 371(a)-(c). They may also receive compensation for law-related and extra-judicial activities, not exceeding fifteen percent of their salary in a calendar year. *Code of Conduct for United States Judges,* Canon 6; 5 *U.S.C.A.* Appendix, § 501(a). In contrast, state judges in New Jersey face mandatory retirement at age seventy. *N.J. Const.* art. VI, § 6, ¶ 3. They may not receive any payment for quasi-judicial activities like teaching or writing about the law while serving as a judge. *Code of Judicial Conduct,* Canon 6; *see also N.J. Const.* art. VI, § 6, ¶ 6 ("[Judges] shall not, while in office, engage in ... other gainful pursuit."). As a result, it is not at all

uncommon for state judges to pursue employment when they approach mandatory retirement or at a younger age if they step down earlier. Those and other considerations may help inform the Committees' work.

## VI.

As the Assignment Judge aptly noted, the employment discussions at the heart of this case were a "momentary slip" in Judge Escala's unblemished tenure. That brief episode should not overshadow a lengthy, fine and dedicated career in public service. But the standard of judicial conduct is necessarily high "so that the integrity and independence of the judiciary may be preserved." *State v. Clark*, 191 *N.J.* 503, 513, 924 *A.*2d 542 (2007) (internal quotation marks and citations omitted). The fundamental need to maintain public confidence in the impartiality of the judiciary compels the decision reached in this case.

We reverse the judgment of the Appellate Division and remand for a new trial consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO, and HOENS—7.

*Opposed*—None.