**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1406-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

RANDY K. WASHINGTON,
a/k/a BILLY JONES,

    Defendant-Appellant.

_____

Submitted September 25, 2019 – Decided October 22, 2019

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 15-06-0714.

Joseph E. Krakora, Public Defender, attorney for appellant (Mark Zavotsky, Designated Counsel, on the brief).

Angelo J. Onofri, Mercer County Prosecutor, attorney for respondent (Laura C. Sunyak, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

In 2015, a Mercer County grand jury indicted defendant Randy K. Washington on one count of murder, N.J.S.A. 2C:11-3, one count of second degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a), one count of second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b), two counts of third degree resisting arrest, N.J.S.A. 2C:29-2(a), one count of fourth degree obstructing the administration of law, N.J.S.A. 2C:29-1, and one count of fourth degree criminal trespass, N.J.S.A. 2C:18-3(a). The State subsequently dismissed the criminal trespass charge. On July 6, 2017, a jury found defendant guilty of all remaining charges, except one count of resisting arrest.

On September 22, 2017, after merging the count for possession of a weapon for an unlawful purpose, the court sentenced defendant on his murder conviction to a seventy-year prison term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court also imposed a concurrent ten-year prison term with five years of parole ineligibility on the count for unlawful possession of a handgun. After merging the obstruction count, the court also imposed a concurrent five-year prison term with no parole disqualifier on the count of resisting arrest.

On appeal, defendant raises the following arguments:

Point I

DEFENDANT'S MOTION FOR [ACQUITTAL] MADE AFTER THE STATE PRESENTED ITS CASE WAS DENIED IN ERROR.

Point II

DEFENDANT'S MOTION TO SUPPRESS THE EVIDENCE OBTAINED FROM THE WARRANTLESS SEARCH OF HIS CELL PHONE AND DENIAL OF A FRANKS[1] HEARING TO CHALLENGE PROBABLE CAUSE ON THE SUBSEQUENT WARRANT WERE DENIED IN ERROR.

Point III

THE TRIAL JUDGE ERRED IN FAILING TO RECUSE HERSELF FOR COMMENTS MADE AT A STATUS CONFERENCE WHICH CREATED AN APPEARANCE OF IMPROPRIETY THEREBY PREVENTING THE DEFENDANT FROM RECEIVING A FAIR AND IMPARTIAL TRIAL.

Point IV

DENIAL OF DEFENDANT'S MOTION TO DISMISS THE [INDICTMENT] WAS IN ERROR BECAUSE HALF-TRUTHS MISLED THE GRAND JURY TO BELIEVE THE DEFENDANT WAS IDENTIFIED AS THE SHOOTER [RESPONSIBLE] FOR THE DEATH OF SILAS JOHNSON[, JR.]

---

[1] Franks v. Delaware, 438 U.S. 154, 155 (1978).

A-1406-17T2

Point V

DEFENDANT'S SENTENCE WAS EXCESSIVE.

Having considered these arguments in light of the applicable law and facts, we affirm defendant's conviction and remand for the trial court to resentence defendant in accordance with Subsection E of this opinion.

I.

We discern the following facts from the record. On October 29, 2014, at approximately 10:12 a.m., the Trenton Police Department received a report of a shooting in progress at the Route 1 and Market Street overpass. Officers located the victim, Silas Johnson, Jr., suffering from gunshot wounds. The victim was transported to a local medical center, where he succumbed to his injuries and died.

A subsequent investigation by the Trenton Police Department revealed that the victim and defendant had boarded the same train on the day of the shooting. Both men exited the train in Trenton, with defendant following behind the victim. Video footage showed defendant was wearing a gray American Eagle brand sweatshirt with white lettering and was carrying a bicycle when he got off the train. He also wore a tight-fitting hat on his head. Defendant

left his bicycle with an acquaintance. Defendant's former girlfriend, S.H.,[2] identified this bicycle as the one she saw defendant take when he left her house on the morning of the shooting.

A number of witnesses observed an altercation between the victim and an assailant before shots were fired. One witness, A.C., observed the altercation and later told police the attacker "came up behind [the victim] and just began to punch him . . . [and] after he punched him for a little bit he overtook him to the ground." As A.C. turned away from the fight, he heard two gunshots. He ran from the area but looked back and saw the attacker standing over the victim. A.C. described the attacker as an African American man, dressed in a dark army-type jacket over a gray hooded sweatshirt, with a black winter hat worn tightly to the head.

Two other witnesses, a mother and her son, confirmed they also saw the altercation. The mother later told police one of the men wore a gray jacket with a pink backpack on his back and the "last thing that [she] managed to see was the moment when [the attacker] was trying to take [the backpack] off." Her son also advised police he saw the assailant "struggling to take off a peach or light colored book bag he was wearing." The son further confirmed he saw the

---

[2] We refer to witnesses by their initials in order to protect their privacy.

A-1406-17T2

attacker run toward the highway, still wearing a gray hooded sweatshirt. S.H. later informed police that a pink backpack found near the scene of the shooting belonged to her daughter. She testified at trial that she had last seen this backpack when she dated defendant.

A local firefighter also described the attacker as an African American male, "[wearing a] gray hoodie, [with] white lettering, [and a] black . . . skull cap on his head" with a gun in his hand. The firefighter told police that photos of a gray sweatshirt with a white eagle and lettering represented "the type of sweatshirt that [he] saw on the man running with the gun on October 29[,] 2014." Likewise, J.P., a homeless individual who saw the suspect run past him, recalled the suspect was an African American male, wearing a gray shirt and blue pants. Still another witness, a detective working near the scene of the shooting, described the suspect as an African American male, wearing a gray long-sleeve t-shirt, covered in sweat and wearing blue jeans. According to the detective, the suspect was looking side-to-side as if "to see if someone was after him." The detective approached the suspect, who "stopped, walked back northbound on Route 1, on the grass, and then changed his direction . . . ." The suspect then "ran right towards [the detective and his partner] and up a wall about [fifteen] feet."

Defendant was captured on surveillance video taken from a recovery center near the attack. The video showed defendant arriving at the center shortly after the attack, wearing a long-sleeve gray shirt, which appeared to be covered in sweat. A receptionist at the center asked defendant to leave and later testified that he looked suspicious, "like he was hiding from someone."

Defendant was arrested in an alleyway after he left the center. Following his arrest, some eyewitnesses to the attack, as well as eyewitnesses to the suspect's flight path, were escorted by police to perform a "show-up" identification. No eyewitness positively identified defendant as the assailant. For example, by the time A.C. saw defendant, he told police defendant was not wearing the jacket or hat A.C. remembered seeing on the suspect. At another show-up identification, J.P. told police he believed some of defendant's physical features differed from that of the suspect, but that defendant's clothing was similar to the suspect's clothing.

Based on the accounts of various witnesses, officers tracked the attacker's path of flight and found two discharged Federal .45 caliber shell casings and a .45 caliber projectile. They also recovered a loaded black semi-automatic Norinco .45 caliber handgun lying next to a pink backpack. Forensic testing matched the shell casings and projectile to the recovered handgun. When

7

additional forensic testing was conducted on a gray sweatshirt found in the suspect's flight path, DNA on the sweatshirt matched that of defendant.

Police also found a cellphone on defendant's person at the time of his arrest. Defendant unsuccessfully moved to suppress evidence found on this cellphone, claiming police searched it before obtaining a warrant and that this illegal search revealed the name of his girlfriend. The State disputed this claim, insisting police learned S.H.'s identity from defendant's mother. The State further maintained the phone was not searched until a Communications Data Warrant (CDW) was obtained. Once a judge authorized the CDW, police extracted a text message from defendant to S.H. that had been sent minutes before the shooting. The text message read, "this Old Head got it, I'm get him when he get off."

Defendant denied having any involvement with the murder. He took the same position at trial when he testified on his own behalf. Likewise, when J.P. testified for the defense, he was asked if defendant was the man he saw fleeing the crime scene. J.P. responded, "I'm positive. It's not the guy." On cross-examination, however, he admitted telling police that the suspect who ran past J.P. was wearing a gray shirt and blue pants.

A-1406-17T2

We first address the arguments pertaining to defendant's pretrial motions and then address the issues regarding his motion for acquittal and sentence.

II.

A. Motion for Dismissal of Indictment

In Point IV of his brief, defendant claims the court erred when it denied his motion to dismiss the indictment. We disagree.

An indictment is presumed valid and should only be dismissed if it is "manifestly deficient or palpably defective." State v. Hogan, 144 N.J. 216, 229 (1996). We review a trial court's decision on a motion to dismiss an indictment for abuse of discretion. State v. Saavedra, 222 N.J. 39, 55 (2015). "A trial court's exercise of this discretionary power will not be disturbed on appeal 'unless it has been clearly abused.'" Id. at 55-56 (quoting State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994)).

"At the grand jury stage, the State is not required to present enough evidence to sustain a conviction." State v. Feliciano, 224 N.J. 351, 380 (2016). Our Supreme Court has explained, "[t]he grand jury 'is an accusative rather than an adjudicative body,' whose task is to 'assess whether there is adequate basis for bringing a criminal charge.'" Saavedra, 222 N.J. at 56 (quoting Hogan, 144 N.J. at 229-30). "A trial court deciding a motion to dismiss an indictment determines

9

'whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it.'" Id. at 56-57 (quoting State v. Morrison, 188 N.J. 2, 13 (2006)).

In Hogan, our Supreme Court outlined two duties of the State in presenting evidence to a grand jury. 144 N.J. at 236-37. First, the Court stated that "in establishing its prima facie case against the accused, the State may not deceive the grand jury or present its evidence in a way that is tantamount to telling the grand jury a 'half-truth.'" Id. at 236. Second, the Court recognized the duty of the State to present evidence, known to the prosecutor, "that both directly negates the guilt of the accused and is clearly exculpatory." Id. at 237 (rejecting the majority's decision in United States v. Williams, 504 U.S. 36 (1992)). However, Hogan recognized that evidence is not deemed "clearly exculpatory," thereby warranting dismissal of the indictment, "if contradicted by the incriminating testimony of a number of other witnesses." Id. at 238.

Defendant maintains the State failed to present J.P.'s exculpatory statements to the grand jury. He also argues the State allowed its witness, Detective Scott Rich, to present misleading testimony during grand jury proceedings. In particular, defendant insists Detective Rich mischaracterized

10

the statements of J.P. and A.C. He asserts Detective Rich's testimony wrongfully left grand jurors with the impression that J.P. believed there was a chance defendant was the man J.P. saw fleeing the crime scene. Additionally, defendant argues the detective's testimony misled the grand jury into believing A.C. identified defendant as the aggressor during the attack. We find no merit to these arguments.

The record reflects Detective Rich's testimony before the grand jury covered accounts from various eyewitnesses pertaining to the murder suspect. When the detective was asked if J.P. had been able to identify defendant's face after the attack, Detective Rich responded, "[n]o, not for a hundred percent certain." But, when asked again if J.P. was able to identify defendant, the detective answered firmly, "[n]o."

Next, when relaying statements A.C. had made to police, Detective Rich told grand jurors that A.C. described the suspect as an African American man, of thin to medium build, who wore a dark army type jacket, gray hoodie and a tight-fitting winter hat. Detective Rich also recalled A.C. had been told by the attacker, "this guy raped my sister" and "to call 9-1-1" but then the suspect told A.C. not to call 9-1-1.

Importantly, as grand jury proceedings were concluding, the assistant prosecutor summarized the detective's testimony about J.P., A.C. and the

firefighter who had identified a gray hoodie in police photos as similar to that of the suspect.  She stated:

> We spoke about how [A.C.] could not identify the defendant through a show-up [identification,] nor could [J.P.], nor could [the firefighter]. But [the firefighter] . . . was the individual who identified the American Eagle sweatshirt as . . . having been on the defendant; is that correct?"

Detective Rich answered, [y]es that is correct."

After a careful review of the transcript of the grand jury proceedings, we are satisfied the trial judge did not err in denying defendant's motion to dismiss. The record supports her finding that Detective Rich did not mischaracterize the statements of J.P. or A.C.  Further, the record supports her finding that the State did not elicit statements from Detective Rich in such a way as to deceive grand jurors.  As the judge pointed out, the State presented information to the grand jury which was arguably inconsistent with the clothing description given by certain witnesses.  Further, the record shows the assistant prosecutor made clear that neither A.C. nor J.P. were able to identify defendant following his arrest, even though she admitted she was "going to describe the aggressor as the defendant."

We also are satisfied there is ample support in the record for the trial judge's determination that the State did not withhold clearly exculpatory

evidence from grand jurors. As the judge noted when citing to <u>Hogan</u>, "exculpatory testimony of one eyewitness is not . . . clearly exculpatory if contradicted by the incriminating testimony of a number of witnesses." Since the trial judge properly applied the <u>Hogan</u> principles and found sufficient evidence of each element of the charged crimes, defendant's motion to dismiss his indictment was properly denied.

## B. Motion to Suppress Evidence

In Point II, defendant asserts the court erred when it denied his motion to suppress evidence. Again, we disagree.

Our review of a trial court's decision on a motion to suppress is limited. <u>State v. Robinson</u>, 200 N.J. 1, 15 (2009). "Appellate review of a motion judge's factual findings in a suppression hearing is highly deferential." <u>State v. Gonzales</u>, 227 N.J. 77, 101 (2016) (citing <u>State v. Hubbard</u>, 222 N.J. 249, 262, (2015)). The appellate court is obliged to uphold the motion judge's factual findings so long as sufficient credible evidence in the record supports those findings. <u>Ibid.</u> (citations omitted); <u>see</u> <u>State v. Dunbar</u>, 229 N.J. 521, 538 (2017). This court will thus "reverse only when the trial court's determination is 'so clearly mistaken that the interests of justice demand intervention and correction.'" <u>State v. Gamble</u>, 218 N.J. 412, 425 (2014) (quoting <u>State v. Elders</u>,

192 N.J. 224, 244 (2007)). However, it owes no deference to the trial court's legal conclusions or interpretations of the legal consequences flowing from established facts, and reviews questions of law de novo. State v. Watts, 223 N.J 503, 516 (2015).

"[A] search based on a properly obtained warrant is presumed valid." Robinson, 200 N.J. at 7-8 (quoting State v. Valencia, 93 N.J. 126, 133 (1983)). A defendant challenging the validity of a search warrant has the burden to prove there was no probable cause supporting the issuance of the warrant or that the search was otherwise unreasonable. Ibid. A reviewing court must "pay substantial deference to the [issuing] judge's determination" of probable cause. State v. Dispoto, 383 N.J. Super. 205, 216 (App. Div. 2006). Any doubts as to the validity of the search warrant "should ordinarily be resolved by sustaining the search." State v. Keyes, 184 N.J 541, 554 (2005) (citations omitted).

When a defendant challenges the veracity of a search warrant affidavit and demands a Franks hearing, that defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." Robinson, 200 N.J. at 7 (citation omitted). Absent materiality of the falsity, the warrant remains valid, and no hearing is required. Franks, 438 U.S. at 171-72.

Here, defendant claims that before police secured a CDW, arresting officers searched a cell phone they found in his pants. He insists this illegal search revealed the identity of S.H. and triggered the discovery of evidence against him. Defendant asserts any evidence recovered from this phone should have been suppressed. He also claims he was entitled to a Franks hearing because the CDW affiant falsely stated S.H.'s identity was disclosed when police interviewed defendant's mother.

When the suppression motion was heard, the State disputed defendant's claims and argued against suppression, insisting defendant could not assert a reasonable expectation of privacy in a stolen cellphone. On appeal, the State again maintains that after defendant's arrest, law enforcement immediately transferred defendant's cellphone to the Mercer County Prosecutor's Office and a detective promptly prepared an affidavit for a CDW. The State further claims defendant's phone was not searched before the court issued the CDW. Moreover, because the investigating officers discovered S.H.'s identity independent of the cellphone search, no Franks hearing was needed.

The trial judge addressed these factual disputes and found defendant did not present sufficient evidence to undermine the validity of the search or question the truthfulness of the affiant's statements. The judge noted: "I don't

15

have a certification or anything from [defendant's mother].  [Defendant] wasn't there.  He was arrested at the time that the police alleged that they spoke to his mother."

On the record before us, we discern no basis to disturb either the judge's denial of the suppression motion or her denial of defendant's request for a Franks hearing.  Certainly, defendant's bald assertions did not warrant granting the relief he requested.

C.  Motion for Recusal

In Point III, defendant argues the trial judge should have granted his motion for her recusal.  This argument also lacks merit.

Several pre-trial conferences were conducted in this matter.  It is undisputed that during one such conference on May 9, 2016, as defendant was leaving the courtroom, he engaged in a profane tirade.  We have not been provided with a transcript from this proceeding, but we are informed that after exited the courtroom, an assistant prosecutor praised the trial judge for her patience in dealing with defendant.  The trial judge then remarked she had the ability to sentence defendant.  Defendant waited until April 2017 to formally complain about this remark and seek the judge's recusal.  Defendant posited that

the judge's comment suggested she would exact retribution against him if he was found guilty of the pending charges.

The State opposed defendant's motion, claiming he was "judge shopping." In support of its position, the State pointed to a remark defendant had made in court during another conference in October 2016 where he told the judge, "you're going to be off the case too, bitch."

Certainly, judges "must avoid all impropriety and appearance of impropriety." State v. McCabe, 201 N.J. 34, 43 (2010) (quoting DeNike v. Cupo, 196 N.J. 502, 514 (2008)). "In other words, judges must avoid acting in a biased way or in a manner that may be perceived as partial." DeNike, 196 N.J. at 514.

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky v. United States, 510 U.S. 540, 555 (1994). On the other hand, comments may support a bias or partiality challenge if they reveal a high degree of favoritism or antagonism as to make fair judgment impossible. Ibid.

Canon 3, Rule 3.17(B) of the Code of Judicial Conduct and Rule 1:12-1 provide guidance on the issue of disqualification. Canon 3, Rule 3.17(B)

17

provides that "[j]udges shall disqualify themselves in proceedings in which their impartiality or the appearance of their impartiality might reasonably be questioned" based on factors, such as personal bias towards a party. As the Supreme Court noted, one must ask, "[w]ould a reasonable, fully informed person have doubts about the judge's impartiality?" State v. Dalal, 221 N.J. 601, 606 (2015) (quoting DeNike, 196 N.J. at 517). But "DeNike does not set forth any bright-line rules," and instead, "the standard calls for an individualized consideration of the facts of a given case." Id. at 607. Essentially, motions for recusal "are entrusted to the sound discretion of the judge and the judge's decision is subject to review for abuse of discretion." McCabe, 201 N.J. at 45 (citing Panitch v. Panitch, 339 N.J. Super. 63, 66, 71 (App. Div. 2001)).

"It is improper for a judge to withdraw from a case upon a mere suggestion that [s]he is disqualified 'unless the alleged cause of recusal is known by [the judge] to exist or is shown to be true in fact.'" Panitch, 339 N.J. Super. at 66 (quoting Hundred East Credit Corp. v. Shuster, 212 N.J. Super. 350, 358 (App. Div. 1986)).

Here, to her credit, the trial judge comported with our case law's command that she explain the "objective and subjective bases for [her] ultimate decision." Magill v. Casel, 238 N.J. Super. 57, 65 (App. Div. 1990). In her oral decision,

the judge analyzed the objective context of the sentencing remark against the conduct which spurred it and concluded no recusal was needed. The judge stated:

> In terms of the comment that I said[,] well, I do decide his sentencing and I don't recall and I take counsel at their word, they listened to CourtSmart, he may have been out of the room, I would say that to him as he's standing here now - - he's sitting here now. I do decide his sentencing if he is convicted at trial. That's a fact. That's up to the jury. Now, I'm not saying I'm going to hold one way or another, I'm not going to prejudge. I review presentence reports, I hear from counsel, if it gets to that . . . . So my whole point in addressing Mr. Washington and making whatever comments I made is to advise him that we have to proceed through the rules and in an orderly fashion to get him his fair trial and any outbursts on his part, as I said before, don't help things. . . . So all that being said even in light - - and I understand [defense counsel's] concern about the comment that, you know, I made apparently on May 9th but I don't believe that that would rise - - given all the circumstances [,] to a reason for me to recuse myself.

We are satisfied that neither the judge's remark in isolation, nor in the context of the proceedings, provides an "'objectively reasonable' belief that the proceedings were unfair." DeNike, 196 N.J. at 517 (quoting State v. Marshall, 148 N.J. 89, 279 (1997)). Therefore, the judge's comment about being able to sentence defendant does not serve as a basis of recusal.

D.  Motion for Judgment of Acquittal

In Point I, defendant argues the court erred when it denied his motion for judgment of acquittal.  However, a trial court is to enter an order for a judgment of acquittal only "if the evidence is insufficient to warrant a conviction." R. 3:18-1.

> [T]he question the trial judge must determine is whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [State v. Reyes, 50 N.J. 454, 458-59 (1967).]

We apply the same standard on appeal.  State v. Kittrell, 145 N.J. 112, 130 (1996).  Under Rule 3:18-1, we "confine our analysis of the adequacy of the evidence to the State's case and the inferences to be derived therefrom." State v. Samuels, 189 N.J. 236, 245 (2007). "If the evidence satisfied that standard, the motion must be denied." State v. Spivey, 179 N.J. 229, 236 (2004).

A motion for judgment of acquittal may be denied even where a defendant's proofs contradict those of the State; such contentions do not necessarily "warrant the removal of the case from the consideration of the jury." State v. Graziani, 60 N.J. Super. 1, 15-16 (App. Div. 1959).

Our review of the record establishes there was ample testimony to support the trial court's decision to deny defendant's motion for judgment of acquittal. For example, multiple witnesses provided descriptions of the shooter that matched defendant's characteristics. Surveillance footage of the defendant also confirmed his presence on the same train as the victim and in the area of the shooting after the attack. Moreover, defendant's sweatshirt, containing his DNA, was found in the suspect's path of flight, as was the murder weapon and a pink backpack identified by his girlfriend. Lastly, a message retrieved from defendant's cellphone showed he sent S.H. a text while sitting on the train, mere minutes before the murder, which read, "this Old Head got it, I'm get him when he get off." Giving the State the benefit of all favorable testimony, as we must for a motion for judgment of acquittal, we perceive no error in the denial of defendant's motion.

E. Defendant's Sentence

In Point V, defendant contends his sentence is excessive. The record reflects he did not appear at his sentence and refused to submit to a presentence investigation, even though he was directed by the court to do so. Further, on the day of sentencing, defense counsel advised the court he had been instructed by defendant not to say anything on his behalf or allow anyone to do so. Defense

counsel then conceded "aggravating factors 3, 6 and 9 apply here" and "I can't see mitigating factors. I think I'd be trying to fool the court in putting those forward."

Before we review defendant's argument regarding the sentence imposed by the trial court, we are compelled to sua sponte address the trial judge's failure to carry out the Supreme Court's mandate in State v Tedesco, 214 N.J. 177, 191 (2013), which made clear that "[a]lthough [a] defendant can waive his constitutional right to appear at sentencing, he cannot force the court to sentence him in absentia."[3] Thus, the Court adopted a multi-factor standard that trial judges must apply to determine whether a defendant is entitled to be sentenced in absentia.

This approach requires the trial judge to first determine whether defendant's "waiver of the right to appear at sentencing is voluntary knowing, and competent, and made with the advice of counsel." Id. at 194 (citing State v. Dunne, 124 N.J. 303, 317 (1991)). However, the judge must also consider the rights of the victims and their families codified in the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38, and The Victim's Rights Amendment in our

_____

[3] We are equally vexed by the parties' failure to formally address this material issue in their respective appellate briefs.

A-1406-17T2

State's Constitution. <u>N.J. Const.</u> art. I, ¶ 22. <u>Id.</u> at 193-194 (internal citation omitted). Thus, before granting a defendant's request not to appear at the sentencing hearing, trial judges:

> must question the defendant in open court or, in special cases, by a live video, digital, or equivalent connection. As a practical matter, this inquiry is only required if a court is inclined to grant defendant's request. Trial judges should also determine whether a defendant's waiver is offered in good faith. Finally, courts must consider and balance the relevant interests.
>
> The public has an interest in the effective and fair administration of justice. That calls for resolving matters fairly, openly, and expeditiously, in the presence of all parties and counsel, and in a way that promotes respect for our system of justice.
>
> The public also has an interest in holding defendants publicly accountable for their actions once they have been convicted at a fair trial. The more serious the offense, the stronger that interest is. In the context of sentencing in a democratic society, public accountability includes having the judge speak openly and directly to the defendant.
>
> [<u>Ibid.</u> (internal citation omitted).]

Here, as the following part of the sentencing hearing shows, neither the trial judge, the prosecutor, nor defense counsel made any effort to comply with the Court's mandate in <u>Tedesco</u>:

> DEFENSE COUNSEL:  Good afternoon, Your Honor
> . . . I am representing Mr. Washington who is not here

23

today. In fact, just a few minutes ago he appeared by video. I asked him for probably a second or third time did he want to be present at least by video while the sentencing went forward and he indicated he did not and so the officers took him back to his cell.

THE COURT: Okay, also, I shared with counsel prior to coming on the record a handwritten letter or note I received from Mr. Washington. It was dated 9/17/17 where he advised I will not be at sentencing on 9/22. My new attorney . . . said he will talk to you.

DEFENSE COUNSEL: Correct, Your Honor.

THE COURT: So everybody saw a copy of that. So then we will go forward with the sentencing in Mr. Washington's absence. Now, I understand that we have some people who do wish to speak but before we get to that, has everyone received a copy of the presentence report . . . ?

The record shows three members of the victim's family were present and addressed the judge before the imposition of sentence.

Writing for a unanimous Court in State v. Jones, Justice LaVecchia noted:

Fairly recently, we underscored the discretion reposed in the judges who are called on to preside over criminal sentencing proceedings. In [Tedesco], 214 N.J. 177 [at 188-89 . . . ], we stated that "[i]n our system of justice, we entrust trial judges with the responsibility to control courtroom proceedings at trial and sentencing." The trial court is and must be the master of the courtroom in such a setting.

The trial court is tasked with the important responsibility of maintaining the dignity and fairness of

a sentencing proceeding while balancing the interests of all who are affected by the sentencing of a defendant.

[232 N.J. 308, 318 (2018) (emphasis added).]

In this light, we are compelled to remand this matter for the trial judge to conduct a <u>Tedesco</u> hearing and resentence defendant after making the findings mandated by the Supreme Court. In making this determination, the trial judge should be guided by "the interests of the public, the defendant, the victims, and the State." 214 N.J. at 192-193. The trial judge must conduct this hearing and resentence defendant within thirty days from the date of this opinion. By no later than ten days thereafter, defendant shall notify the Clerk of the Appellate Division whether he will rely on the brief submitted to this court or file a new brief limited to the sentence imposed by the court on remand. If defendant decides to file a new brief, the Clerk of the Appellate Division will issue a new briefing schedule to the parties. No extensions will be granted absent a showing of extraordinary circumstances.

Defendant's conviction is affirmed. We retain jurisdiction to review defendant's sentence in accordance with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1406-17T2