# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1831-22
                 A-1832-22

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANANCY,

       Plaintiff-Respondent,

v.

J.F. and S.S.,

       Defendants-Appellants/
       Cross-Respondents.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF P.S.-S.F.
and J.-A.S.F., minors,

       Cross-Appellants.

_____

Submitted January 7, 2025 – Decided February 11, 2025

Before Judges Sumners and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FG-04-0063-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant/cross-respondent J.F. in A-1831-22 (Amy M. Williams, Designated Counsel, on the briefs).

Jennifer N. Sellitti, Public Defender, attorney for appellant/cross-respondent S.S. in A-1832-22 (Daniel A. DiLella, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Lori DeCarlo, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors/cross-appellants (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Damen J. Thiel, Designated Counsel, on the brief).

PER CURIAM

Defendants J.F. (Jane)[1] and S.S. (Sam) appeal the February 2, 2023 Family Part order terminating their parental rights to their children, Penny, who was born in August 2014, and Jerry, who was born in August 2016.[2] Defendants were tried together and their appeals have been consolidated for the purpose of issuing a single opinion.

---

[1] We use acronyms and pseudonyms to preserve confidentiality. R. 1:38-3(d). For ease of reference, we use the same pseudonyms that are used in the parties' briefs.

[2] Jane and Sam do not have any other children together, but they each have other children who are not involved in this litigation.

The guardianship trial was convened over the course of thirteen nonconsecutive days during which the Division of Child Protection and Permanency (the Division) presented extensive fact testimony from the Division caseworkers and police officers. The Division also introduced expert psychological testimony opining that Jane and Sam were not fit to parent Penny and Jerry and would not be for the foreseeable future. In addition, it presented evidence concerning bonding evaluations.

Both defendants contend the Division failed to prove by clear and convincing evidence the four prongs of the best-interests-of-the-child statutory test set forth in N.J.S.A. 30:4C-15.1(A). The Law Guardian representing the children supports defendants' contention that the Division failed to establish the basis for terminating parental rights by clear and convincing evidence. Sam further contends the trial court should have recused herself after he threatened her.

As we explain below, there have been developments that occurred after the trial court issued its ruling that lead us to remand for the trial court to reconsider its rulings.

# I.

Because we remand this matter for the trial court to reconsider its decision in light of recent developments, we need only briefly summarize the pertinent evidence presented at the guardianship trial. The guardianship trial was conducted between October 3, 2022 through February 2, 2023. The Division's first witness was Marisol Figueroa, the Division's adoption caseworker who was assigned to the case when the Division recommended termination of parental rights and the case moved to the guardianship docket.

Figueroa testified that the Division offered a wide variety of services to Sam, Jane, Penny, and Jerry, up to and during the guardianship proceedings. She discussed at length her communications with Sam through telephone and email. She described how Sam frequently emailed her and that he was occasionally "threatening, explosive, [and] aggressive towards the Division and its workers." Figueroa noted the difficulty she had scheduling virtual visitations between Sam and Penny, and Sam's unwillingness to comply with the visitation schedule.

Figueroa further testified about Jane. She stated that while Jane was better with scheduling and attending visitation than Sam, Jane still had issues with timeliness and behavior. In addition, Figueroa testified that despite the final

4

restraining orders (FRO) reinforced by court orders from the guardianship trial court, Jane continued to have contact with both Sam and her former paramour, Carl.

Figueroa also testified about the potential alternatives to adoption, and the process by which she ruled out other potential placements with family members that Sam and Jane had suggested. Sam's mother was ruled out because "she did not have suitable housing" for the children. Jane's father was ruled out because he would not provide the Division his address and was likely living with Jane. Sam claimed his girlfriend was willing to serve as a placement, but he never provided her contact information, and she did not otherwise make herself known to the Division.

Figueroa explained that Sally, Penny and Jerry's resource parent at the time of trial, was meeting their needs, had a good rapport with the children, and was willing to adopt them both.[3]

The Division's next witness was Dr. Melanie Freedman, PsyD., an expert in clinical and forensic psychology. She performed psychological evaluations of Jane and Sam, and bonding evaluations. Freedman's evaluation of Jane consisted of two components: an interview-style in-person assessment as well

---

[3] As we later explain, Jerry's resource placement has since changed.

as several written diagnostic tests for Jane to complete. Freedman explained that Jane frequently dismissed or downplayed the history and seriousness of the domestic violence in her relationships. More specifically, Jane told Freedman that her relationship with Carl was better than her previous relationships. She also reported that the children requested to see Carl during visits. Freedman noted that when she asked Jane about his criminal history, Jane became defensive, demanded to view the underlying criminal documents personally, denied having contact with Carl, and claimed that any contact they did have previously was only by phone and not in person.

Freedman opined that Jane failed to take any responsibility for the Division's removal of Penny and Jerry and blamed her issues on the men in her life, and on the Division. She expressed that Jane's answers were occasionally inconsistent with her previous answers. Freedman also testified that during Jane's psychological evaluation, she had several outbursts concerning the Division's role in her family that were loud enough to prompt a security officer to check on them. According to Freedman, Jane was "not in control of her emotional experiences."

Based on the interview, Freedman concluded Jane was not willing to change her disordered relationships with the men in her life that had a negative

impact on the children. Freedman diagnosed Jane with borderline personality disorder and attention deficit disorder and ruled out an opioid use disorder in early remission.

Freedman concluded that Jane's personality disorder might prevent her from addressing Penny's and Jerry's needs. She cited Jane's outbursts, which could startle or embarrass the children, a disordered childhood that increased Penny's and Jerry's need for a stable and supportive environment, and Jane's "mixed results" in treatment and need for long-term therapy. Accordingly, Freedman generally found that Jane would not be a suitable placement for Penny or Jerry now or in the foreseeable future. She observed Jane's consistent tardiness for visitations, missed drug screens, and inconsistent therapy record evinced an unwillingness to modify her behavior to suit Penny's and Jerry's needs.

Freedman further testified that she conducted a bonding evaluation between Jane, Penny, and Jerry. Freedman stated that Jane quickly began asking the children "intrusive" questions which she found to be "highly critical" of them, and that this behavior caused Penny to be reserved. In Freedman's opinion, Jane's connection to Penny was "neutral to weak or not very strong" while her bond with Jerry was "neutral to positive."

A-1831-22

Freedman also conducted a psychological evaluation of Sam. She testified that his demeanor was "arrogant," he smelled of marijuana, and he refused to remove his sunglasses during the interview. After she asked him questions about his substance abuse history, Sam admitted to drinking and smoking marijuana before the evaluation. Freedman noted that Sam was very hostile to the Division and was fixated on his earlier "false" imprisonment. In the interview, Sam asserted that he wanted to reunify with the children, however, when probed by Freedman he could not formulate a plan and did not take responsibility for his noncompliance with the Division's services. Freedman also believed Sam was mostly focused on his relationship with Jerry and "the legacy that he wanted to leave his son," and less focused on his relationship with Penny.

Freedman found that Sam had poor insight and judgment and diagnosed him with narcissistic personality disorder, but ruled out cannabis use disorder. Freedman explained that his diagnosis was based in part on Sam's refusal to listen to or accommodate the opinion of others, which could lead to educational or medical neglect of the children if Sam's opinions did not align with those of medical and educational practitioners. She also highlighted the potential emotional trauma for the children, who would either need to conform to Sam's world view or conflict with him. She contended that Sam would not be capable

of safely parenting either Penny or Jerry, that he could not meet Jerry's elevated needs, and that he lacked an appropriately stable living environment.

With respect to the bonding evaluations, Freedman testified that Penny was uncomfortable with Sam and asked him not to touch her. Sam did not appear to be concerned about Penny's wishes, which caused Freedman to worry about how he might act when he is not being observed. She determined that Penny's bond with Sam was "weak and negative" and Jerry's attachment to Sam was "relatively positive."

Freedman also conducted a bonding evaluation between Sally and Penny. Jerry did not attend the session because he reportedly had "some kind of emotional or behavioral breakdown" that day. Freedman found that Penny was "very comfortable, very relaxed " with Sally, and they had a positive attachment. While she was not able to evaluate Jerry directly, Freedman reviewed his medical records and thought it was "likely" that his behaviors stemmed from Jane's tumultuous relationships with Sam and Carl. She did not offer an opinion on the bond between Sally and Jerry.

Freedman concluded that Penny would likely not "experience long-term enduring harm" if her relationship with Jane and Sam was severed. Furthermore, any harm caused could be ameliorated through her relationship with Sally.

9

Freedman's report stated that Penny would be at a "high risk" of physical or emotional harm if she were returned to Jane or Sam's care.

As for Jerry, Freedman also believed that he would likely not "experience long-term enduring harm" if his relationship with Jane and Sam was severed. Freedman stressed that Jerry's needs required a caretaker who could address them, and that Sam and Jane were not capable of meeting Jerry's behavioral needs. She maintained that permanency and stability would be important to the development of both children, and further delays in achieving that permanency might put them at risk of developing additional behavioral and emotional issues. Ultimately, Freedman concluded that terminating Jane's and Sam's paternal rights would best serve Penny and Jerry. She further opined that the resource home adoption by Sally would give Penny and Jerry[4] "the best chance for a safe, stable, and emotionally healthy life."

Catherine Williams, the Division permanency worker, testified about her various attempts to meet with and provide services to Sam. She described an incident when Sam told her that he did not plan to utilize any of the Division's services "because all of the services were a result of his illegal incarceration." Sam also told Williams that he planned to initiate a federal lawsuit to reclaim

---

[4] As we have noted, Jerry's resource placement has since changed.

Jerry. He continued to say that he had friends in the federal government and FBI, and that he was going to take Jerry to Iran "to have him train there to come back and work at the [United States] [g]overnment and infiltrate the U.S. [g]overnment."

Williams also testified regarding her interactions with Jane. She noted that Jane had frequent outbursts of anger and constantly called, texted, and emailed Williams. In addition, Jane accused the Division of kidnapping Penny and Jerry.

Williams testified about her observations of Sally, Penny, and Jerry. Williams had a positive opinion of their relationship and stated that Sally was meeting the children's needs.

The Division presented Voorhees Township Police Department Detective Chase Waldman, who responded to the incident at the Wawa. Waldman confirmed that Carl assaulted Jane in the presence of Penny and Jerry. The Division also presented testimony of Somerdale police officer, Corporal John-Paul Massaro. He testified that "over the years" he personally responded to Jane's home for service calls approximately sixty times, and that the police department responded to service calls at Jane's home a "little over" 250 times. In 2022, he estimated he went to Jane's home about ten times, and the police

department responded to sixty-nine calls. When asked why the police responded to Jane's address on these occasions, Massaro testified that "the majority of them [were] domestic violence related." A significant portion of the 2022 calls were reports that Carl was present at the house. Massaro stated that although sometimes Jane herself was the caller, she was "typically pretty hostile" to police when they came.

Brittany McConville also testified for the Division. McConville was a mental health specialist at the Rutgers University residential facility that housed Jerry. At the time of her testimony, Jerry had been at the facility for about three months. She recounted that, on October 15, 2022, Jane was "very late" to visit Jerry which agitated her to the point that she needed help from the staff to calm down before the visit with Jerry. On October 22, Jane came to visit again but brought her father, who was not an approved visitor. McConville testified that the facility refused Jane's father entry, which caused Jane to become "d[y]sregulated." After Jane sat with staff for fifteen minutes, Jerry was brought in for the visit. Two days later, Jane became combative and accusatory, asserting that the staff was not taking care of the children.

Williams testified that soon thereafter, Jane said that Jerry had defecated on himself and insisted on taking him into a staff bathroom to bathe him, despite

12

being warned that the facilities were inadequate. While bathing him, she saw that he had some eczema on the inside of his upper thighs. Williams testified that by the time Jane was bathing Jerry, Jane was screaming at her and pointing fingers, insisting that Williams view Jerry's eczema. Williams explained to Jane that facility staff would not know about a patient's eczema on the upper thigh unless the patient was comfortable sharing that information with staff, and that it would not be appropriate for her to see Jerry in a state of undress. After Jane changed Jerry, she refused staff's requests to leave for about ten minutes, at which point they called the police, and she was escorted from the building.

Jane testified on her own behalf. When asked why she did not inform the police that Carl took the children in November 2020, she claimed to have suffered from "Stockholm syndrome." However, she continued to deny that Carl had abused Jerry and asserted that the Division did not substantiate any abuse.

She defended taking pictures of Jerry at Rutgers, despite knowing they were prohibited, claiming it was necessary to show the pictures to the trial court as well as Sam. Furthermore, she stated that she was not reacting to his eczema, but to red marks on him that demonstrated he had been restrained in the Rutgers facility. She later explained that she brought her father to the October 22, 2022 visit at Rutgers because they allowed him to attend her visits with Penny,

generally denied that she had been asked not to bathe Jerry, and disputed the staff's account of the incident.

Jane admitted that her mortgage payments were delinquent, but insisted she could provide a stable and safe environment for Penny and Jerry. Jane claimed no knowledge of Carl's arrest in her home in September 2022, then acknowledged that Carl got into some kind of dispute with her father. She also testified that her home has a security system, and that she would purchase a gun if she thought it was required to protect her children.

When asked why she saw Sam in Atlantic City, she said they incidentally ran into each other and blamed her friend for allowing Sam to occupy one of the two rooms that the friend had booked for the evening. When addressing various times that she had been in contact with Sam despite the restraining order, including the Atlantic City incident and the pictures she sent Sam of Jerry at Rutgers, she justified the violations as "co-parenting."

Sam's mother, Brenda, testified on his behalf. She confirmed that she did not have enough space to house Penny and Jerry, however, claimed the Division did not respond to her request for financial help. She also testified that Sam occasionally stayed with her.

14

Sam also testified. He testified that he was incarcerated when Penny was born, but soon thereafter he was released in August 2013 as part of the Intensive Supervision Program (ISP) and began seeing Penny three to four times a week. He stated that when he completed ISP, he moved in with Jane in November 2014, and that they were living together in 2016 when Jerry was born. He explained that sometime in 2016, he and Jane decided to relocate the children to her mother's and father's house in Texas. He testified that Jane stayed in New Jersey because of her business there while he worked in Arizona at the time, and Jane's parents had the children in daycare and received assistance from the State of Texas to help care for them.

Sam further testified that while Penny and Jerry lived in Texas, he saw the children relatively frequently and had a good relationship with Jane's mother and father. Then, in late 2018, Sam came to New Jersey to resolve some traffic tickets that were preventing him from getting a driver's license in Texas, and while here was arrested and incarcerated. He claimed his incarceration, which he described as being "illegally kidnapped from the children," caused the children's relocation back to New Jersey. He also testified that because of his incarceration and failures by the Department of Corrections, he did not receive proper notice of any hearings concerning Penny and Jerry. Sam also stated that

15

he had not received mailed notices from the Division, asserting that he preferred contact through email, and generally blamed the Division for his failure to receive services. In addition, Sam asserted that he is "just a fall-out guy" because he is black and the father, and that is what "all this is about." He alleged the Division preferred Jane because she was a woman.

Sam testified that his plan for reunification was either to have the children reunify with him or live with Brenda while he helped her with expenses. He admitted to violating his FRO by contacting Jane, but blamed Jane for the more recent violation that occurred in Atlantic City.

## II.

The trial court made extensive findings. The court's presentation of the facts shows that it accepted the testimony of Figueroa, the Division caseworker, which it described as "detailed." The court found that she "tried her best in this case to work with each of the parents despite the volatile nature of each of them." The court further stated that Figuroa "was not biased in her testimony" and made several favorable remarks about Jane. It noted the successful visits where the kids would play with the activities Jane brought, eat the food she would bring, and appeared to enjoy each other's company.

The trial court similarly accepted the testimony of the psychologist, Freedman, calling her testimony "insightful" and undisputed. The court also accepted the testimony of Waldman and Massaro—the Voorhees and Somerdale police officers—by incorporating their testimony directly into its factual findings.

The trial court stated that McConville, the mental health specialist from Rutgers, gave credible testimony that was "factual." The court also found that Williams, the Division permanency caseworker, was a "well prepared excellent witness" who delivered "facts, not bias in the recitation" of testimony.

The trial court's evaluation of Jane's and Sam's credibility, in stark contrast, was negative. The court described them as living in a "fantasy world." For example, at least five of Jane's answers to questions were non-responsive, striking portions of her testimony. The court referred to Jane's emotional dysregulation while testifying, her "rambling" and her failure to respond to her attorney's questioning.

The court also found that Sam "seemed to have a selective memory of what he got or didn't get" from the Division and that "he had a game . . . he had an agenda" in this litigation separate from protecting his parental rights.

The trial court made detailed legal findings regarding the best-interests test. It found that Jane's consistent lateness, occasionally cancelled visits or services, and explosive outbursts at caregivers showed a parent who was not capable of putting their children's needs first. The court also held that Jane was "unable to break the domestic violence cycle." In making this finding, it cited two specific instances: the Wawa incident in which Jane failed to protect her children from witnessing Carl's domestic violence and Jane's assertions as to the cause of the injuries documented in the Child Abuse Research Education and Service Institute's evaluation report. The court also observed that Jane, despite receiving services, was not capable of regulating her emotions, which harmed Penny and Jerry.

Moreover, the trial court found that Jane's mental health diagnosis, poor prognosis, and entanglements with abusive paramours—which Freedman testified to—demonstrated the future harm Penny and Jerry would be subject to if they were re-unified with Jane. The court further found that Freedman was correct in concluding that Sam was incapable of properly parenting Penny or Jerry, and that Jane and Sam's toxic relationship demonstrated their inability to focus on the children's needs.

The trial court found that further delays to permanency for Penny and Jerry would harm them. The court also concluded that Jane and Sam were not currently fit to parent, and they would not be fit to parent in the foreseeable future. It explained that the services offered to Jane and Sam constituted "more than reasonable efforts" to provide services to each parent. For Jane specifically, the court cited the "litany" of services provided. For Sam, it cited instances in which the Division offered him a variety of services, and resources that would connect him with those services, only for Sam to make additional requests or outright rebuff the attempts. The court also noted that "the degree of services aren't measured by how effective they are" and "you can't force a parent" to engage in services or attend appointments. Further, it emphasized that Sam's complaints about the restrictions on the number and type of visitations afforded to him were unjustified and that when Sam did get to have in-person visits, his behavior was poor.

The trial court held that the Division made a reasonable effort to assess relatives as an alternative placement for Penny and Jerry. As to Brenda, it noted that Brenda lived in a one-bedroom apartment with her boyfriend, did not have the resources to get a larger space, and that the Division is not required to provide financial support to facilitate a family placement. The court doubted

19

Brenda was capable of providing Penny and Jerry the care they needed, citing an incident during testimony where she downplayed Sam's disruptive behavior.

Finally, while acknowledging that Penny and Jerry loved Jane and have expressed a desire to be reunified with Jane, the trial court found that reunification would do more harm than good, based in part on Freedman's expert testimony. Ultimately, the court concluded that "there are no alternatives to termination of parental rights; termination of parental rights followed by adoption by the resource parent is in the best interests of these children under all of the circumstances."

Based on the foregoing findings, on February 2, 2023, the trial court issued the order terminating parental rights. This appeal followed. Jane raises the following contention for our consideration:

> POINT I
>
> THE TRIAL COURT INCORRECTLY CONCLUDED THE DIVISION ESTABLISHED, BY CLEAR AND CONVINCING EVIDENCE, ALL FOUR PRONGS OF THE BEST INTERESTS STANDARD, WHICH IS THE MINIMUM LEGAL THRESHOLD REQUIRED FOR A CONSTITUTIONALLY VALID TERMINATION OF THE PARENTAL RELATIONSHIP.

A-1831-22

In her reply brief, Jane also raises the following argument:

POINT I

THE DIVISION'S RESPONSIVE BRIEF PRESENTS NO EVIDENCE OR ARGUMENT TO REBUT OR OVERCOME THE LEGAL ARGUMENTS ASSERTED BY THE MOTHER OR THE LAW GUARDIAN ON BEHALF OF PENNY AND JERRY THAT THE JUDGMENT OF GUARDIANSHIP BELOW WAS ERRONEOUS AND SHOULD BE VACATED.

Sam raises the following contentions for our consideration:

POINT I

THE JUDGE ERRED IN REFUSING TO RECUSE HERSELF UPON THE MOTIONS BY [SAM].

POINT II

THE FIRST, SECOND AND THIRD PRONGS OF THE BEST INTEREST[S] TEST WERE NOT PROVEN BY [THE DIVISION], DUE TO [THE DIVISION'S] FAILURE TO PROVIDE APPROPRIATE SERVICES OR CONSIDER ALTERNATIVES TO THE TERMINATION OF PARENTAL RIGHTS.

POINT III

THE [TRIAL] COURT SHOULD NOT HAVE USED THE SEPARATION-FROM-FOSTER-CAREGIVER HARM DELETED FROM THE SECOND PRONG OF THE BEST INTERESTS TEST TO DECIDE PRONG FOUR.

Sam raises the following additional contentions in his reply brief:

POINT I

[THE DIVISION'S] FAILURE TO FACILITATE VISITATION WAS TOTALLY UNREASONABLE AND PRECLUDED THE FORMATION OF A STRONG RELATIONSHIP BETWEEN [SAM] AND HIS CHILDREN; [THE DIVISION'S] FAILURE TO ASSIST THE PATERNAL GRANDMOTHER AS A POTENTIAL PLACEMENT FOR THE CHILDREN WAS ALSO PATENTLY UNREASONABLE.

POINT II

THE [LAW GUARDIAN] CORRECTLY ASSERT[S] THAT THE TRIAL COURT'S SECOND AND FOURTH PRONG CONCLUSIONS ARE UNSUPPORTED BY THE RECORD AND MUST BE REVERSED, WHILE ALSO RIGHTFULLY SEEKING ADDITIONAL TIME TO FORM A RELATIONSHIP WITH [SAM].

Finally, the Law Guardian's cross-appeal on behalf of the children raises the following arguments for our consideration:

POINT I

THE JUDGMENT OF GUARDIANSHIP TERMINATING [JANE AND SAM'S] PARENTAL RIGHTS SHOULD BE REVERSED BECAUSE THE DIVISION DID NOT ESTABLISH ALL FOUR PRONGS OF THE BEST INTERESTS TEST BY CLEAR AND CONVINCING EVIDENCE.

    A. The Trial Court Incorrectly Found, Pursuant To N.J.S.A. 30:4C-15.1(a)(2), That [Jane] Was

A-1831-22

Unable And Unwilling To Eliminate The Harm She Posed To The Children And Was Unable To Provide A Safe And Stable Home.

B. The Trial Court Incorrectly Found, Pursuant To N.J.S.A. 30:4C-15.1(a)(4), That Termination Of [Jane and Sam's] Parental Rights Would Not Cause The Children More Harm Than Good.

## III.

There have been significant developments since the guardianship trial and appeals briefs were submitted. On May 28, 2024, after a psychiatric hospitalization, Jerry was transferred to a new resource home. In its August 16, 2024 letter submitted to us pursuant to Rule 2:6-11(d)(3), the Attorney General stated that "there are still no relatives willing and able to care for [Jerry]." The letter explained that "the Division's plan for [Jerry] is adoption by his new resource parents" and that "[Penny's] placement is unchanged."

We note neither defendant nor the Law Guardian responded to the Attorney General's August 16, 2024 letter. No party sought a remand. The case was submitted to us on our January 7, 2025 waiver calendar. On January 14, we asked the parties to submit letters on whether a remand to the trial court is necessary and appropriate to make new best-interests findings to account for the impact of the post-judgment resource placement development.

23

The Attorney General, representing the Division, responded that a remand is neither needed nor appropriate. The Division asserts that its plan remains for Penny to be adopted by Sally, and for Jerry to be adopted by his current resource parents. The Division contends a remand "would only further deprive [Jerry] of permanency and is contrary to his best interest[s]." The Division further contends "the court's determination on prong four [of the best interests test] was never predicated on bonding, nor does the presence or absence of a bond with [Jerry's] current resource parent alter it now." The Division adds "the court's analysis was focused on the parents' lack of parental fitness, and not the bond or any guarantee of adoption with Sally." It relies on N.J. Div. of Youth & Fam. Serv. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996), for the proposition that when termination is based on parental unfitness rather than bonding, the proper inquiry under the fourth prong is the child's need for permanency and the parent's ability to care for the child in the foreseeable future.

Jane submitted a letter in response to our request, noting "at the very least, the Division's plan that the [m]other's parental rights should be terminated so that Jerry could be adopted by Sally is no longer viable." Jane adds that "[a]s to Penny, no expert has opined as to the harm that might befall her if she were to be permanently separated from Jerry if Sally were to adopt Penny, while Jerry's

permanency plan necessarily was revised." Thus, Jane argues, "Penny's best interests must be revisited in light of these changed circumstances."

Sam's letter responding to our request argues the matter must be remanded to allow the trial court to make another best-interests finding for Jerry. Sam notes that when the trial court terminated his parental rights, it stated, "upon [Jerry's] discharge [from a long-term residential facility for children with emotional and behavior difficulties] it would behoove him to be placed in a home setting that is highly structured and safe. And with an individual who can be attuned to his special needs and comply with all discharge instructions." In support of his argument for remand, Sam stresses that "the court knows nothing about the [current] placement" and whether the new resource family is "'attuned to [the child's] special needs'" and "is willing and able to 'comply with all discharge instructions.'"

The Law Guardian, who represents the interests of both children, contends "a remand to the trial court is necessary and appropriate to establish a record with respect to the developments in the placement circumstances of the children . . . particularly as relates to the fourth prong of the best interests test." The Law Guardian adds:

> With respect to Penny, though her resource placement has not changed since trial, Jerry's re-placement into

another home is a change of circumstances that has impacted her bests interests. A remand is required to protect her best interests with respect to continuing in her placement in Jerry's absence, her position as to that placement, and her continuing right to maintain a sibling relationship with Jerry notwithstanding the Division's plans to have the children adopted into different homes. This change of circumstances requires a remand for the court to make an updated factual record and legal findings under the fourth prong of N.J.S.A. 30:4C-15.1(a).

## IV.

We agree with the Law Guardian that a remand is needed so the trial court can make updated factual and legal findings under the bests-interests test to account for the post-trial developments. The trial court heard bonding evaluation testimony and considered it as part of its analysis of prong four. We acknowledge that there was no bonding evaluation testimony pertaining to the relationship between Jerry and Sally, but only because Jerry had a mental health breakdown on the day of the scheduled evaluation. The record suggests that the Division had intended to obtain such an evaluation, signifying it considered such an evaluation to be relevant in discharging its responsibilities. Further, as the Law Guardian aptly notes, the trial court had no occasion to consider the impact on the children occasioned by the fact that they will not be adopted by the same resource parent and thus will be separated.

26

In these circumstances, we deem it prudent for the trial court to reconsider its ruling in light of the change in circumstances that occurred after trial. In reaching this conclusion, we find helpful guidance in New Jersey Div. of Child Protection and Permanency v. D.A., where we noted:

> Although we do not find the judge's finding on prong four "wide of the mark" as of the time of the decision, in this unusual factual context, we must reverse and remand as to prong four and the portion of prong three requiring the court to consider alternatives to termination. The post-judgment developments require a fresh inquiry. See [N.J. Div. of Youth & Fam. Serv. v.] T.S., 417 N.J. Super. [228,] 249-50 [(App. Div. 2010)] (remanding for a prong four inquiry based on post-trial developments).
>
> [477 N.J. Super. 63, 83 (App. Div. 2023).]

We decline to exercise what would be tantamount to original jurisdiction on the question of whether and how the post-judgment developments alter the calculus of the best-interests factors. See State v. Santos, 210 N.J. 129, 142 (2012) (explaining that original jurisdiction by an appellate court is disfavored where fact-finding is involved). Relatedly, an appellate court should not invoke original jurisdiction where evidence needs to be weighed anew. Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999). See also State v. Micelli, 215 N.J. 284, 293 (2013) (ruling that original jurisdiction by an appellate court is disfavored if the evidence poses issues of credibility or

27

requires the subjective and intuitive evaluations of a trial court). We emphasize that the deference we accord to Family Part judges is based in part on their specialized expertise. See Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 373-74 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)) (alteration in original) ("Because of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding."). In this instance, the trial court is best situated to determine not only the impact of the new placement plan for Jerry, but also whether the court's own findings and legal conclusions would have been different had the change in resource placement for Jerry occurred before trial.

Accordingly, we remand for trial court to reconsider its parental termination order to solely account for the change of circumstances since trial. The remand should be completed within sixty days. However, that period may be extended upon request to our court if the trial court in its discretion determines that additional professional evaluations or hearings are needed. In that event, the reconsideration should be completed as expeditiously as practicable. We direct the parties to provide the trial court with all briefs and letters submitted in this appeal. We retain jurisdiction.

A-1831-22

V.

Although we remand for the trial court to reconsider its guardianship rulings, we proceed to address Sam's contention that the trial court erred by refusing to recuse itself. Sam alleges that the trial court is biased against him because of his threats. In rejecting Sam's arguments, we decline to countenance his attempts to forum shop and delay the guardianship proceedings.

In its oral decision denying Sam's recusal motion, the trial court noted that Sam did not file any papers, but relied on the general argument that his threat against the judge and the resulting litigation would create a conflict between Sam and the judge. The court found that Sam did not "assert[] any grounds by which there is an objectively reasonable belief that I cannot be fair and impartial." It further reasoned that Sam's arguments, if supported, did not constitute even the appearance of impropriety.

On Sam's motion for reconsideration, the trial court explained that even if the initial motion had been timely and properly supported by the relevant paperwork—which was submitted by counsel in support of the motion for reconsideration—there still would not have been a basis to grant the recusal, as there was nothing that would prevent the trial court from conducting a fair and

unbiased trial. The trial court suggested that Sam was "forum shopping" and "seeking to delay the proceedings."

Rule 1:12-1(g) states that a judge should recuse "when there is any other reason which might preclude a fair and unbiased hearing and judgment, or which might reasonably lead counsel or the parties to believe so." "Motions for disqualification must be made directly to the judge presiding over the case." State v. McCabe, 201 N.J. 34, 45 (2010). Such motions "are entrusted to the sound discretion of the judge and are subject to review for abuse of discretion." Ibid. (citing Panitch v. Panitch, 339 N.J. Super. 63, 66, 71 (App. Div. 2001)). Reviewing courts should employ the following legal standard: "Would a reasonable, fully informed person have doubts about the judge's impartiality?" DeNike v. Cupo, 196 N.J. 502, 517 (2008).

In State v. Dalal, 221 N.J. 601, 608 (2015), our Supreme Court made plain, "we believe that when there is any evidence that a defendant has conveyed a threat to prompt the recusal of a judge or somehow manipulate the proceedings, recusal is not required." The Court further stated, "[t]o assess a defendant's objective, a judge may consider direct evidence and also draw reasonable inferences from the record." Ibid.

A-1831-22

The Court added:

> When judges apply the DeNike standard in a case that involves a threat against a member of the Judiciary, they may consider the following factors, among others: the nature and context of the threat; whether there is any evidence that the threat was designed, in whole or part, to manipulate the system and/or force a recusal; whether the threat was meant to be communicated to the judge or was delivered in connection with a court proceeding relating to the defendant's case; whether evidence of the threat will be presented or referred to at trial; and whether the judge presiding over the case is the object of the threat. In the unusual circumstances of this matter, we also consider whether any judge who has been threatened is still serving in the vicinage.
>
> [Ibid.]

The Court also noted, "[t]he timing of a threat matters as well. For example, a defendant's outburst in the middle of a trial, with the presentation of evidence to a jury underway, might reasonably be seen as an attempt to thwart the orderly administration of justice and would not necessarily call for recusal." Id. at 609.

Here, it is readily apparent that Sam was trying to abuse the legal process by delaying the proceedings or getting a new judge assigned. The record shows he tried the same tactic against another Family Part judge before the case was transferred to the guardianship docket. There comes a point when a litigant cannot be accorded de facto control over proceedings by making threats to gain a strategic advantage. Furthermore, in this instance, the threat to the trial judge

31

was delivered less than a month before the scheduled guardianship trial. On these facts, we do not hesitate to conclude that Sam's threats were intended to manipulate the system. We are satisfied that a reasonable, fully informed person would see through this strategy and would not doubt the trial court's impartiality. See DeNike, 196 N.J. at 517.

Affirmed in part and remanded in part. We retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1831-22